Ronald Edward **DENTON**, Appellant,

v.

**UNITED STATES of America,**
Appellee.

No. 17820.

United States Court of Appeals
Ninth Circuit.

Nov. 16, 1962.

George W. Oglesby, Nogales, Ariz.,
for appellant.

Charles A. Muecke, U. S. Atty., and
Jo Ann D. Diamos, Asst. U. S. Atty.,
Tucson, Ariz., for appellee.

Before CHAMBERS and JERTBERG,
Circuit Judges, and CLARK, District
Judge.

CHASE A. CLARK, District Judge.

After waiver of indictment on December 12, 1961, information was filed against the Defendant, Appellant here, containing two counts.

Count one charges: "On or about the 3rd day of December 1961, within the District of Arizona, Ronald Edward Denton did, in violation of 21 USCA 174, fraudulently and knowingly import, and cause to be imported, and bring into the United States of America, contrary to law, approximately thirteen (13) grams of heroin, a narcotic drug".

Count two charges: "on or about the 3rd day of December 1961, within the District of Arizona, the Defendant, Ronald Edward Denton, in violation of [18] USC 111, wilfully, knowingly and forceably resisted, opposed and assaulted Robert J. Eyman, a Customs Agent, well knowing said agent was engaged in the performance of his official duties, to-wit: conducting a border search of the said defendant, said Robert J. Eyman having been a duly appointed and qualified Customs Agent of the United States Government".

On December 28, 1961, Motion to Suppress Evidence was filed.

On January 5 and 6, 1962, hearing on said motion was had and at the conclusion of the hearing the motion was denied.

Defendant waived trial by jury and on January 11, 1962, the defendant was tried before the Court and convicted on both counts of the information. The matter is here on appeal from this conviction.

Appellant's assignment of error is: "The Court erred in holding that the search of the defendant was legal and

in refusing to grant defendant's motion to suppress the evidence".

We find nothing in appellant's brief which attacks the validity of the judgment of conviction imposed on appellant under Count 2 of the Information which charges a violation of 18 U.S.C. § 111, which in substance charges the appellant with having assaulted a federal officer while in the performance of his duties. So we need only concern ourselves with appellant's one and only assignment of error, which goes to Count 1 of the information.

The matter was submitted to this Court on briefs, without oral argument.

The evidence submitted to the trial Court at the hearing on the motion to suppress, and at the trial discloses the following facts: Robert J. Eyman an investigator with the United States Treasury Department, on the evening of December 3, 1961, was advised by an informant, who, according to Agent Eyman, had furnished reliable information on previous occasions,—that a person answering the description of the defendant, as to physical characteristics and clothing worn, had been seen talking to a known narcotic peddler in Nogales, Sonora, Mexico, and negotiating for the purchase of a quantity of heroin.

Agent Eyman immediately placed lookouts at two inspection stations at Nogales, Arizona; Moberly Avenue station and Grand Avenue station.

Later during the evening of December 3, 1961, defendant approached the Grand Avenue Station, from Mexico. Ray Melvin Tudor, inspecting agent or officer on duty at the Grand Avenue Station at the time, observed the defendant approach on foot, recognizing him from Agent Eyman's description. Officer Tudor inquired of the defendant if he was bringing anything from Mexico and was told by the defendant that he didn't have anything. Agent Eyman, who was also at the Grand Avenue station at the time of the arrival of the defendant, asked defendant to place his personal effects on a counter, this was done and the effects

were examined by Agent Eyman. Defendant was asked to disrobe, which he did, and examination of defendant's person was made by Agent Eyman, who testified that he saw a shiny clear substance, similar to vaseline, in and around the rectal area of the defendant. Agent Eyman asked the defendant if he was carrying any narcotics and defendant stated that he was not and also stated that he had never been in Nogales before. Agent Eyman asked defendant if he would object to a physical examination by a doctor and the defendant agreed to such examination. Defendant contends that he did not consent to such examination.

Agent Eyman asked Customs Agent Leonard Viles and Doctor Alvin George Koslin, United States Public Health Physician to come to Grand Avenue inspection station. Upon arrival at the station Viles recognized defendant as a suspected smuggler whom he had searched some five months previously, stating that at that time he had not been examined by a physician. When Doctor Koslin arrived he, the defendant, Agent Eyman and Agent Viles walked to the Public Health Office which is in the Immigration Building adjacent to the Grand Avenue inspection station. Upon arrival at Doctor Koslin's office defendant stated that he objected to the examination. In fact the record discloses that he, thereafter, continued to object to the examination. The record also discloses that Agent Eyman at about that time had a telephone conversation with the United States District Attorney, and it was decided that the examination would be made, forcibly if necessary, and Agent Eyman so advised the defendant.

Doctor Koslin attempted several times to make an examination of the rectum and anal canal. At times during the attempted examination the defendant stood up, which action terminated the attempt. On one occasion the defendant stood up suddenly, causing the Doctor to fall to his knees. He also pushed Agent Eyman aside, at which time Agent Eyman placed the defendant under arrest for assaulting an officer.

Doctor Koslin used accepted medical procedures and techniques in the attempted examinations. On one attempt he felt a foreign object of rubbery consistency.

Doctor Koslin called Doctor Potzler, a duly licensed, qualified, practicing physician and upon arrival Doctor Potzler asked the defendant if he would submit to another rectal examination, defendant agreed. This examination was not successful nor completed because of the noncooperative attitude of the defendant.

Doctor Potzler requested permission to insert a suppository in an effort to produce a bowel movement. At this time the defendant agreed but later objected generally to the entire proceedings. However, a suppository was inserted and in the following thirty or forty minutes of waiting, no bowel movement resulted. Doctor Potzler then made one more unsuccessful attempt at a rectal examination.

Doctor Potzler then requested permission to give the defendant some nembutal, intravenously. It was explained to the defendant that the dosage would not be enough to put him to sleep, and the defendant agreed. Nembutal is classed as a fast acting sedative, of short duration and not an anesthetic. While the injection was going on the defendant verbally objected and physically resisted, at one time suddenly throwing up his hands. He picked up the surgical table and threw it in the direction of the officers, and also struck Agent Eyman with his fist. The record shows that at no time was the defendant struck by any of the officers or agents. After the defendant became quiet and settled, Doctor Potzler attempted another rectal examination, at this time he felt a foreign object.

After these attempted examinations defendant was told to put on his clothes and was then taken to the Santa Cruz County Jail by Agent Viles, in the agent's car. Agent Eyman and Border Patrolman Floyd followed in Eyman's car. This was about two o'clock A.M. on December 4, 1961.

Defendant was placed in a private inclosure. A clean can or bucket was procured and at this time was placed in the inclosure. Customs Agent Rogers was called to the jail to relieve Agents Eyman and Viles. On seeing the Defendant, Agent Rogers said "I remember him, we searched him and another fellow four or five months back". The defendant slept until three o'clock in the morning when he got up and asked Rogers for the can, which he used for a bowel movement. When he got up Rogers went to the can and removed a rubber contraceptive, showed it to the defendant, and in the presence of the defendant untied a knot in the contraceptive and found a brownish powder inside. Rogers then told the defendant that he was under arrest for smuggling heroin. The contraceptive with the heroin was placed in an envelope, initialed by Agent Rogers and placed in a safe or vault. The custody of this exhibit was traced from the time of recovery to the time of admission as evidence at the trial.

There was very little contradiction in the evidence as shown by the record of the hearing on the motion to suppress the evidence, and the Trial Court very properly accepted the Government Agents' and Doctors' version of what took place.

As pointed out in Appellee's brief: A search of persons entering the United States from a foreign country is in a separate category from searches generally.

This Court in Murgia v. United States, 285 F.2d 14, reiterated the above stated principle concerning border searches and their peculiar category.

In 1957 this Court had before it the case of Blackford v. United States, 247 F.2d 745, which in most respects, as far as the facts are concerned is identical with the case considered here. One difference noted is that the officers testified that Blackford admitted that he had about a spoon of heroin encased in a rubber condom in his rectum, however, according to defendant Blackford, he

never admitted at the border that he was carrying narcotics. In the case here Denton at no time admitted that he was carrying narcotics.

Appellant here contends that because he was not told that he was under arrest for importing heroin until the heroin was removed from his person, that there is a distinction to be drawn between the instant case and the Blackford case.

If there are distinctions to be drawn and if there are differences in the facts, it still leaves the same question to be considered and resolved: Was the search reasonable under the circumstances?

The Statutory basis for a border search is 19 U.S.C.A. § 482, which provides:

"Any of the officers or persons authorized to board or search vessels may stop, search, and examine, as well without as within their respective districts, any vehicle, beast, or person, on which or whom he or they shall suspect there is merchandise which is subject to duty, or shall have been introduced into the United States in any manner contrary to law, whether by the person in possession or charge, or by, in, or upon such vehicle or beast, or otherwise, and to search any trunk or envelope, wherever found, in which he may have a reasonable cause to suspect there is merchandise which was imported contrary to law; and if any such officer or other person so authorized shall find any merchandise on or about any such vehicle, beast, or person, or in any such trunk or envelope, which he shall have reasonable cause to believe is subject to duty, or to have been unlawfully introduced into the United States, whether by the person in possession or charge, or by, in, or upon such vehicle, beast, or otherwise, he shall seize and secure the same for trial."

■ The test for admissibility of evidence seized during a search of a person entering the United States from a foreign country is: "was the search reasonable under the circumstances"?

In the case of Landau v. United States District Attorney for the Southern District of New York (Court of Appeals, Second Circuit) 82 F.2d 285, the Court said: "As early as 1799, the baggage of one entering the country was subject to inspection (1 Stat. 662). The necessity of enforcing the customs laws has always restricted the rights of privacy of those engaged in crossing the international boundary. See Carroll v. United States, 267 U.S. 132, 154, 45 S.Ct. 280, 69 L.Ed. 543, 39 A.L.R. 790. Neither a warrant nor an arrest is needed to authorize a search in these circumstances."

■ In applying the test of reasonableness of the search under the circumstances, we find from the record, as did the Trial Court, that the officers had information which they considered reliable, that the defendant had negotiated for narcotics in Mexico. Contrary to his statement that he had never been in Nogales before he was detained on December 3, 1961, we find that within a short time after his arrival on the evening of December 3, 1961, he was recognized by a Customs Agent as having been searched some five months previously, and again, later the same evening, he was recognized by another Customs Officer as being one of two men who had previously been searched as suspected narcotic smugglers. The officers knew that it was common procedure or practice to bring narcotics across the border at Nogales in body cavities and when Agent Eyman saw the clear shiny substance similar to vaseline around the rectal area of the defendant, there was indeed ample evidence to warrant the search as made in the accepted and customary manner, under sanitary conditions.

At the conclusion of the hearing on the motion to suppress the evidence, the trial Court said:

"Specifically, I find that the defendant originally agreed to the examination by a doctor, but then changed his mind about it and served notice on the officers that he was not consenting, that while he was going through with it he was doing it

under protest. And thereafter he impeded, to the extent he could, the examinations by the doctors. He never did tell them that he withdrew his protest to the examination.

"I find as far as the suppository is concerned, that when the doctor explained to him what he wanted to do, he did verbally consent to it, he did not resist it. And as far as the injection of the nembutal is concerned, I find that he verbally consented to that. That up to the point of the injection he cooperated and didn't raise any physical protest or objection. But after the amount that the doctor testified to, 175 to 250 milligrams had been injected, then he did resist and resist violently. I find the nembutal never did cause him to lapse into unconsciousness and it is doubtful it had any sedating effect at all.

"That as far as his sleeping is concerned, if he did go to sleep —and I don't know whether he did or not—if he did, he didn't go to sleep until after he was in the Santa Cruz County jail, then remained asleep for approximately one hour.

"In all the circumstances I don't find that the search was unreasonable, and consequently the motion to suppress is denied."

We agree with the foregoing findings.

Nowhere during the entire search and examinations, to and including the recovery of the evidence do we find anything unreasonable under the circumstances, or shocking to the conscience.

The question of reasonableness of border searches was decided by this Court in Blackford v. United States of America, 247 F.2d 745, cert. denied 356 U.S. 914, 78 S.Ct. 672, 2 L.Ed.2d 586; Murgia v. United States of America, 285 F.2d 14, cert. denied 366 U.S. 977, 81 S.Ct. 1946, 6 L.Ed.2d 1265; and Witt v. United States of America, 287 F.2d 389, cert. denied 366 U.S. 950, 81 S.Ct. 1904, 6 L.Ed.2d 1242.

The ruling of the trial Court on the motion to suppress and the judgment of conviction is affirmed.