Moises **RIVAS**, Appellant,

v.

**UNITED STATES of America,**
Appellee.

No. 20556.

United States Court of Appeals
Ninth Circuit.

Nov. 8, 1966.

James R. Hagan, Menlo Park, Cal., for appellant.

Manuel L. Real, U. S. Atty., John K. Van de Kamp, Robert L. Brosio, Phillip W. Johnson, Asst. U. S. Attys., Los Angeles, Cal., for appellee.

Before CHAMBERS, BARNES and CECIL,* Circuit Judges.

BARNES, Circuit Judge:

This is an appeal from the two count conviction of appellant (a) of the unlawful importation of narcotics, and (b) of the unlawful concealment of narcotics, knowingly brought into the United States in violation of law. (21 U.S.C. § 174). The "narcotic" was twenty-nine Percodan tablets. Appellant was sentenced to two five-year concurrent sentences, with a recommendation for treatment for narcotic addiction, and for vocational training.

Jurisdiction existed below pursuant to 18 U.S.C. § 3231, and exists here under 28 U.S.C. §§ 1291, 1294.

Two errors are charged by appellant. One is in the instructions relating to the alleged narcotic; the second is in the introduction into evidence of alleged narcotics obtained through an unlawful search of appellant's rectum.[1]

---

\* Lester L. Cecil, Senior Circuit Judge of the Sixth Circuit, sitting by designation.

1. Counsel for appellant did not state the issues raised in this manner. For example, he states the question to be:

"Do Customs agents at the International Borders of the United States have the *unlimited* and *absolute* right, *unrestricted in scope*, to search *by force* and without arrest or warrant the rectum or *other body cavities of all persons entering this country?*" (Emphasis added.)

As the government correctly points out, such a broad question does not present the actual issue on this appeal. As it points out, "Not everyone entering this country is under the influence of narcotics." Nor is everyone entering this country a convicted user of narcotics, required to register when leaving this country and to report in when returning; nor does everyone crossing bear "fresh" needle marks. Thus as to the italicized areas, *supra*, the question is not accurate. We are not here concerned (1) with an unlimited right; or an absolute right;

We first consider the lawfulness of the search. The legal question presented is whether the search here made of appellant's rectum goes so far beyond the limits defined by previous decisions in this troubled area, that the search became unlawful as violative of the reasonableness required by Article IV of the Amendments to our United States Constitution.

This issue was raised in a timely manner below, and a hearing on appellant's motion to suppress the evidence was had. The trial court made findings of fact and conclusions of law, holding the search reasonable.

We quote both the trial judge's findings, and his conclusions on the motion to suppress evidence (see also, oral findings; R.T. p. 69, line 9 to p. 73, line 12):

## "FINDINGS OF FACT

### I

"The defendant crossed the international border from Mexico into the United States on April 16, 1965, about 2:40 p. m., and at that time he presented a registration certificate pursuant to Title 18, United States Code, Section 1407. The purpose of this statute was to make a classification of persons who were narcotic prone in order that they might be given suitable attention at the border when they entered the United States.

### II

"That when this certificate was presented to Customs Inspector Lloyd Hanson, he observed the defendant to be nervous and he observed the defendant's arms and saw what he believed to be fresh needle marks. Therefore, he called Customs Agent Paul Samaduroff to make a further investigation of the matter.

### III

"Prior to Customs Agent Samaduroff's arrival at the border, Inspector Hanson made a personal search of the defendant,

or (2) a right unrestricted in scope; or (3) a right unrestricted in force; or (4) the search of body cavities other than the

MOISES RIVAS. During this inspection, the defendant refused to spread his buttocks cheeks in order that an observation might be made of his rectum. Due to this refusal, Inspector Hanson concluded that the defendant might possibly be concealing something in his rectum. As a result, the defendant was taken by Customs Agents Samaduroff and Gore to the office of Dr. Paul Salerno.

### IV

"The defendant, MOISES RIVAS, went willingly and without objection to the doctor's office. At the time he was transported to the doctor's office, he was not then under arrest but was in custody pursuant to procedures for a border search.

### V

"At the doctor's office the defendant consented to an examination, made by the doctor, of his arms and eyes. Upon termination of said examination, the doctor formed an opinion that due to observing fresh needle marks and scarring on the defendant's arms and the defendant's sluggish pupil response to light variations, the defendant was under the influence of a narcotic drug. This information was passed on to and was then known by the Customs agents.

### VI

"That due to this information and the defendant's refusal to allow Inspector Hanson to observe the rectal area of the defendant, the Customs agents requested Dr. Salerno to make a search of the defendant's rectal area. The defendant stated he would not consent to such a rectal examination. Due to this refusal the Customs agents called for additional assistance and Customs Agent Melvin Moore arrived at the doctor's office. The defendant was again informed that a rectal examination would be made and he stated, 'You will have to force me to submit to a rectal examination.'

rectum; or (5) the search of *all persons* entering into this country.

## VII

"That after this refusal by the defendant to consent to the rectal examination, the Customs agents informed the defendant of Title 18, United States Code, Section 111, impeding or assaulting a federal officer. The defendant was told that it was their right and duty to have a digital examination made and that when he resisted this examination, the Customs officers then placed the defendant under arrest for impeding a federal officer in the performance of his duty.

## VIII

"This was a lawful arrest whereas the rectal examination was not made incidental to said arrest. The rectal examination was made upon the information obtained from Customs Inspector Hanson and Dr. Paul Salerno. The arrest for impeding a federal officer was a legal arrest which produced a further right to search as well as the continued right of a border search.

## IX

"That after this arrest the defendant continued to refuse to permit the rectal examination but with the information that the defendant was nervous when he entered the United States, that he had come back as a registrant under Section 1407 of Title 18 of the United States Code, that needle marks were observed on his arms both by Inspector Hanson and subsequently by Dr. Salerno, and Dr. Salerno determined that the needle marks were fresh and that the defendant was under the influence of narcotics, the Customs agents ordered physical force to be used to conduct the rectal examination.

## X

"The rectal examination was performed with a single lubricated rubber-gloved finger of the same manner and type of digital examination made when a male patient goes to a doctor's office for a prostrate [sic] examination, which examinations are conducted continuously in doctor's offices throughout the country.

## XI

"That during this examination some slight discomfort in connection with insertion of the finger into the rectum results. It is more painful to insert foreign objects into the rectum than it is to remove objects from it. The defendant was not hurt in body or tissue but was forcibly detained while the search was being made. That as a result of this search, contraband was obtained.

## XII

"The Fourth Amendment of the United States Constitution does not protect defendants against a border search. Although this case differs from Blackburn and other cases cited, there was in this case sufficient grounds to constitute a search.

## XIII

"The search was not inhuman nor did it offend the sense of decency or humane treatment of the defendant as guaranteed by the Fifth Amendment of the United States Constitution. The Lefkowitz case does not apply inasmuch as this was a border search and border searches are permitted to assure the integrity of the country from materials which might be brought in from abroad. The search is to prevent any sort of contraband, such as diamonds, watches, narcotics, or even espionage material, from being introduced into the United States. It is the right of the agents to protect the borders of the United States.

## XIV

"There was no evidence that a doctor was available at the border and reasonable conduct by the Customs agent was to contact a doctor and take the defendant there immediately. The only delay that occurred was in the transportation of the defendant from the border to the doctor's office, besides the delay while awaiting an additional Customs agent to arrive inasmuch as defendant said he would not consent to the search. Thus, there was no illegal detention which might make inadmissible the evi-

dence obtained in the search as it was conducted in a reasonable time after the entry of the defendant into the United States and made in reasonable conditions.

## "CONCLUSIONS OF LAW

WHEREFORE, this Court makes the following conclusions of law:

### I

"The arrest of the defendant for violation of Title 18, United States Code, Section 111, was a lawful arrest.

### II

"The search made by Dr. Salerno was a legal search.

### III

"The search made by Dr. Salerno was made in a medically approved manner and did not shock the conscience or offend a sense of justice.

### IV

"The search made was a continuing border search with respect to time and distance from the border.

### V

"The United States Government has an absolute right to a border search and no probable cause is necessary.

2. "On April 16, 1965, appellant entered the baggage room at the port of entry at San Ysidro, California, for the purpose of turning in a registration document that must be returned by persons coming from Mexico if they are addicted or convicted of a narcotics offense [R.T. 30]. Appellant entered the room from a passageway from Mexico [R.T. 32].

"United States Customs Inspector Lloyd Hanson talked to appellant, noted that he was 'extremely nervous', examined his arms, and observed what he believed to be fresh needle marks [R.T. 30]. Appellant's eyes were glary [R.T. 32]. Inspector Hanson took him into the search room for a personal search to determine whether he was bringing anything from Mexico [R.T. 30]. The search was made because appellant was nervous, his eyes were glary when he turned in the regis-

## "JUDGMENT

"IT IS THE JUDGMENT OF THIS COURT that the motion of defendant MOISES RIVAS to suppress the evidence in Case No. 34815–SD, be, and the same is, hereby denied." (C.T. pp. 20–25.)

After the completion of the evidence for the government, the defendant renewed his motion to suppress by moving for a judgment of acquittal on both counts, raising both the issues raised on this appeal. The motion was denied.

The trial court twice found (once by inference) "sufficient grounds," i. e., reasonable grounds, for making the search. (See oral findings, R.T. 71, lines 18–20.) In considering such trial court finding, we are required "to give due weight to it." Wong Sun v. United States, 371 U.S. 471, 479, 83 S.Ct. 407 (1963); Hernandez v. United States, 353 F.2d 624, 627 (9th Cir. 1965). Having given "due weight" to the trial court's findings, we arrive at the same conclusion as did the trial judge.

In our review of the facts, we have examined the record thoroughly. The recital of facts in the briefs differs between the two parties. Accepting, as we must, the most favorable interpretation which fairly represents the facts in the record, we adopt the government's Summary of Facts as correct, and set them forth in the margin.[2] With this

tration document, and he had the needle marks [R.T. 32].

"During the search appellant was not cooperative in spreading his cheeks when asked to stoop over and spread them. An officer noted on the search report, 'Likely to be carrying contraband' [R.T. 33–35].

"Customs officers transported appellant to the office of Dr. Paul R. Salerno, located from 10 to 12 miles from the international border [R.T. 13, 37, 58]. [Another witness estimated the distance at from 12 to 15 miles [R.T. 40].]

"Dr. Salerno was a physician engaged in the general practice of medicine in San Diego [R.T. 14]. Dr. Salerno examined appellant and observed 30 recent needle marks on one arm and multiple old and recent needle marks on the other arm. He noted that the pupils of appel-

evidence and the court's factual findings in mind, we turn to the law.

Appellant bases his motion at the trial, and his position on this appeal, on five separate grounds:

(a) That such a search violates the Fourth Amendment;

(b) that such a search violates the Fifth Amendment;

(c) that the search was unconstitutional as an exploratory search;

(d) that the search took place during an illegal period of detention;

(e) that the search was not incident to the arrest of Rivas for impeding federal officers in their duty.

In urging that the search herein was unreasonable, appellant is first required to distinguish our holding in Blackford v. United States, 247 F.2d 745 (9th Cir. 1957), cert. denied 356 U.S. 914, 78 S.Ct. 672, 2 L.Ed.2d 586 (1958). We agree it is factually different, principally because of (a) Blackford's admission that he had concealed contraband per rectum, (b) there was evidence of vaseline about Blackford's anal region, and none here; and (c) there was an arrest in *Blackford*; but none here until after the appellant resisted the search.

Appellant also urges that our holding in Denton v. United States, 310 F.2d 129 (9th Cir. 1962), is distinguishable because the Customs officers there had been told by an informer that a person physically resembling Denton had been seen negotiating for narcotics in Mexico with a known narcotics peddler (idem, p. 130), and while he denied carrying narcotics, was seen to have vaseline around his rectum.

Likewise our holding in Murgia v. United States, 285 F.2d 14 (9th Cir. 1960), cert. denied 366 U.S. 977, 81 S.Ct. 1946, 6 L.Ed.2d 1265 (1961), is claimed to be distinguishable because (1) the search was made after an arrest occurred, primarily because the officers saw what was later found to be "a narcotic addict's kit" thrown from Murgia's auto; and (2) one of Murgia's companions stated Murgia (who had recently crossed the border) had narcotics in his rectum.

Thus there are factual differences in the four cases.

Appellant suggests that the *Blackford* and *Murgia* searches were reasonable because of the respective arrests prior to the forceful search; that *Denton* extends *Blackford* (though stating it does

---

lant's eyes were markedly constricted and that they did not dilate when the illumination was reduced. He concluded that appellant was a user of narcotic drugs and was under the influence of narcotic drugs at the time of the examination [R.T. 15–16].

"According to Dr. Salerno a 'recent' needle mark was one made from one to about seven or eight days previously [R.T. 26].

"Dr. Salerno advised Customs officers that appellant was under the influence of narcotics. Appellant was then advised that a rectal examination would be made. Appellant stated that it was unconstitutional and that they would have to do it by force. [R.T. 110].

"The officers aproached appellant, who began to fight them off. He was arrested for interfering with officers in the performance of their duties and was handcuffed and taken to the doctor's table. His trousers were lowered, and Dr.

Salerno commenced additional examination [R.T. 16, 38]. Three officers restrained appellant during the examination [R.T. 16, 21].

"The rectal examination was performed in a medically-approved manner, involving the use of a single gloved, lubricated finger. This type of examination is a part of routine physical examinations for males, which are performed every day in doctor's offices [R.T. 16, 18].

"It became immediately apparent that a foreign object was in appellant's rectum. The object was gently extricated. It was a rubber-enclosed packet containing tablets inscribed with the trademark of Endo, indicating that they consisted of Percodan [R.T. 16–17].

"Dr. Salerno testified that the removal of the object would involve less discomfort to appellant than the original act of inserting the object. [R.T. 17–18].

"There was no search warrant [R.T. 39]." Appellee's Brief, pp. 3–5.

not), because there was no arrest in *Denton.* Here, says appellant's counsel, the government proposes to extend the rule of what is reasonable beyond *Blackford* and *Denton* to allow Customs officers "to search the rectum [or presumably other body cavities] of any person entering the United States." Appellant states too much. (See note 1, supra.)

We cannot agree that an affirmance in this case would establish any such principle. As was said in *Denton,* supra: "If there are distinctions to be drawn and if there are differences in the facts, it still leaves the same question to be resolved: Was the search reasonable *under the circumstances?*" (Emphasis added. 310 F.2d at 132.)

"The Constitution condemns only an *unreasonable* search. As my Brother Frankfurter says, that determination 'turns on the circumstances presented by a particular situation.'" Mr. Justice

Clark, dissenting, in Chapman v. United States, 365 U.S. 610, 619, 81 S.Ct. 776, 781, 5 L.Ed.2d 828 (1961) (footnote omitted).

This *was* a border search. Border searches are unique. Corngold v. United States, 367 F.2d 1, decided September 29, 1966 (9th Cir.) (dissenting opinion, slip opinion p. 23, and cases cited).

■ Mere suspicion is enough—probable cause is not required.[3]

While it may well shock the average citizen to learn of the common use today of body cavities to smuggle narcotic drugs into the United States,[4] those facing the task of policing our borders are fully familiar with the practical consequence of the failure to make searches of such cavities. Lane v. United States, 321 F.2d 573, 575 (5th Cir. 1963); Blackford v. United States, supra, 247 F.2d at 752.

3. "In conferring upon Customs officers such broad authority, circumscribed only by Constitutional limitations of the Fourth Amendment, the Congress has in effect declared that a search which would be 'unreasonable' within the meaning of the Fourth Amendment, if conducted by police officers in the ordinary case, would be a reasonable search if conducted by Customs officials in lawful pursuit of unlawful imports. Judicial recognition of this distinction has given rise to the term 'border search', in order to distinguish official searches which are reasonable because made solely in the enforcement of Customs laws from other official searches made in connection with general law enforcement.

"Validity for this distinction is found in the fact that the primordial purpose of a search by Customs officers is not to apprehend persons, but to seize contraband property unlawfully imported or brought into the United States. [See The Atlantic, 68 F.2d 8 (2d Cir. 1933).] Accordingly, it is well settled that a search by Customs officials of a vehicle, at the time and place of entering the jurisdiction of the United States, need not be based on probable cause; that 'unsupported' or 'mere' suspicion alone is sufficient to justify such a search for purposes of Customs law enforcement. [Cervantes v. United States, 263 F.2d 800, 803, n. 5 (9th Cir. 1959); see: Carroll v. United States, 267 U.S. 132, 154

[45 S.Ct. 280, 69 L.Ed. 543] (1925); Boyd v. United States, 116 U.S. 616, 623 [6 S.Ct. 524, 29 L.Ed. 746] (1886); Hammond v. United States, 356 F.2d 931 (9th Cir. 1966); King v. United States, 348 F.2d 814, 817 (9th Cir. 1965); Jones v. United States, 326 F.2d 124, 130 (9th Cir. 1964), (concurring opinion of Judge Duniway); Denton v. United States, 310 F.2d 129 (9th Cir. 1962); Mansfield v. United States, 308 F.2d 221 (5th Cir. 1962); Plazola v. United States, 291 F.2d 56 (9th Cir. 1961); Witt v. United States, 287 F.2d 389 (9th Cir. 1961); Murgia v. United States, 285 F.2d 14 (9th Cir. 1960); Landau v. United States Attorney, 82 F.2d 285 (2nd Cir. 1936); United States v. Wischerth, 68 F.2d 161 (2nd Cir. 1933); United States v. Yee Ngee How, 105 F.Supp. 517 (N.D.Calif.1952).]" Alexander v. United States, 362 F.2d 379 at 381–382 (9th Cir. 1966).

4. The use of body cavities to transport narcotics has become an accepted practice by experienced smugglers. This is evidenced by the frequency with which the cases have reached the courts.

In addition to the cases cited, supra, see Ng Pui Yu v. United States, 352 F.2d 626 (9th Cir. 1965); People v. Woods, 139 Cal.App.2d 515, 293 P.2d 901 (1956), cert. denied 352 U.S. 1006, 77 S.Ct. 566, 1 L.Ed.2d 550, and Blefare v. United States, 362 F.2d 870 (9th Cir. 1966).

Smuggling is as prevalent across the Baja California-California border as it is across the Texas-Mexican border. United States v. Bologna, 181 F.Supp. 706, 708 (S.D.Cal.1960); United States v. Eramdjian, 155 F.Supp. 914, 918 (S.D.Cal.1957); also Reyes v. United States, 258 F.2d 774, 785 (9th Cir. 1958).

■ Appellant urges "there must be a clear indication of the possession of narcotics" before a search at a border may be made, using the language of the Supreme Court in Schmerber v. State of California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). We agree. While we know of no accepted meaning of that term in law or as a word of art, it can be readily defined.

"Indication" is defined as "an indicating; suggestion." "Clear" is defined as "free from doubt"; "free from limitation"; "plain."

■ An honest "plain indication" that a search involving an intrusion beyond the body's surface is justified cannot rest on the mere chance that desired evidence may be obtained. Thus we need not hold the search of any body cavity is justified merely because it is a border search, and nothing more. There must exist facts creating a clear indication, or plain suggestion, of the smuggling. Nor need those facts reach the dignity of nor be the equivalent of "probable cause" necessary for an arrest and search at a place other than a border.

Thus, drawing the line between the two poles of proof raises a present problem. The uncertainty of what constitutes a "clear indication" over and beyond a "mere suspicion" is difficult, but not impossible to resolve.

■ We believe a previously convicted and registered user of narcotics (18 U.S.C. § 1407), coming across the border under the influence of narcotics, as readily shown by his eyes, disclosing thirty "recent" needle marks on one arm, and "recent" needle marks on the other, who acts "in an extremely nervous manner," may be searched, as one reasonably portraying a "clear indication" he may be smuggling contraband.

We then reach the question: How much of a search is permissible?

In determining this, we are required as a fact of life to recognize that many people crossing the border, desiring to smuggle goods, and more particularly narcotics, do, and unless stopped, will continue to utilize body cavities, including any of an adequate size that will make such smuggling economically profitable.

Must the United States stand idly by, and permit this? Or should the extent of border searches be governed by the practical knowledge of the extent to which smugglers are willing to degrade their bodies in order to obtain the drugs they crave or the money they desire? As stated by Judge Chambers in his concurring opinion in Blackford, supra, with reference to Rochin (Rochin v. People of California, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952)), "the Supreme Court's policy is to uphold human dignity. * * * [H]ere it was Blackford [the defendant] who created, who first takes us into, this disgusting sequence. * * * What the officers did was not torture or abuse. I do not say the depraved have no rights. But I do say that to my sensibilities, all of the shockingness was Blackford's." 247 F.2d at 754.

This is not a Rochin case, with its physical assault on a defendant, both before the stomach pumping, and at the time of its occurrence. It was the physical assault in Rochin which caused reversal and which "led to a result in Rochin contrary to that in Wolf [Wolf v. [People of State of] Colorado, 338 U.S. 25 [69 S.Ct. 1359, 93 L.Ed. 1782] (1949)]. Although Rochin raised the search-and-seizure question, this Court studiously avoided it and never once mentioned the Wolf case. Obviously it thought the illegal search and seizure alone did not call for reversal." Irvine v. People of State of California, 347 U.S. 128, 133, 74 S.Ct. 381, 383, 98 L.Ed. 561 (1954). See also, Blefare v. United

States, 362 F.2d 870, 876–877, n. 1 (9th Cir. 1966).

Here the evidence shows a technical physical assault (in that hands were laid upon appellant), but no degrading or shameful physical assault upon him, in the sense the Supreme Court found in *Rochin*, supra. It was a technical assault similar to that upheld as proper in *Blackford*, supra. Again, technically, the physical assault, the "gentle" probing of the rectum, was not as pronounced an assault, medically, as the puncture of the skin in Breithaupt v. Abram, 352 U.S. 432, 77 S.Ct. 408, 1 L.Ed.2d 448 (1957). In *Breithaupt*, the blood was taken while the appellant was unconscious. But "the taking of blood by a skilled technician" is not "conduct that shocks the conscience," nor such a method of obtaining evidence as offends a "sense of justice," said the Supreme Court, citing and distinguishing *Rochin*, supra, and Brown v. State of Mississippi, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936). Cf. Schmerber v. State of California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966).[5]

The use of the evidence in this case, like *Rochin, Schmerber, Blackford,* et al. (in fact, in any case where a body cavity is gently, in a medically approved manner, searched), does not (a) involve evidence of a testimonial nature; (b) require a defendant to testify against himself; (c) constitute a denial of due process. (See discussion of these points in Schmerber, supra, 384 U.S. pp. 768–771, 86 S.Ct. 1826.)

Certainly *Schmerber* suggested in determining what constitutes a "clear indication" that will justify a border search of body cavities that the decision had better be left to "a neutral and detached magistrate instead of being judged by an officer engaged in the often competitive enterprise of ferreting out crime." *Schmerber,* supra at 770, 86 S.Ct. at 1835, citing Johnson v. United States, 333 U.S. 10, 13–14, 68 S.Ct. 367, 92 L.Ed. 436 (1948).

But as in *Schmerber,* supra, (where the condition of drunkenness was fast fading away) some action had to be taken. Appellant could not be unnecessarily detained without arrest. He was committing no federal crime in being under the influence of narcotics; he had made his required report as a returning addict. With this in mind, were the border officers required to let him pass, and thus allow the possible entry of contraband into the United States? We think not.

If we hold that the Customs officers (where reasonably clear indications exist that smuggling is taking place through the use of body cavities, which can only be verified by a medical search of the bodily cavities) have no right to make such a search, how are our border guardians to stop such smuggling? We again are faced with the practical problem: must the people of the United States permit the wholesale introduction of narcotic drugs into the United States?

If the government cannot search bodily cavities on bare suspicion, may it not on the basis of a reasonably clear indication? If the government has no basis to search on a clear indication, obviously it can have no reasonable cause to arrest. If the government cannot arrest, and must pursue the suspected individual, how far may it follow him, and when arrest? A thousand difficult problems are created.

The existence of difficult problems of enforcement cannot override a constitutional prohibition against unreasonable search, but we think we must recognize that the welfare of our country depends upon an honest and conscientious determination of what is a reasonable search, in view of all circumstances and conditions then faced by the officers proposing the search.

---

5. In this connection, we point out the following in appellant's brief:
"Search of Rivas' rectum was made by a physician in his office according to accepted medical practice. Therefore appellant has not challenged the manner and means used to carry out the search."

If these surrounding circumstances and conditions make the bodily cavity search a reasonably indicated necessity, then the search is not an unreasonable search, prohibited by the wisdom of our Founding Fathers.

We hold the search of Rivas was clearly indicated and lawful.

We next consider the instructions objected to.

We note the defendant was charged with illegally importing and concealing "29 Percodan tablets, a narcotic drug," under Sections 173 and 174 of Title 21 of the United States Code.

Section 4731(a) of Title 26, United States Code, lists and defines narcotic drugs:

"The words 'narcotic drugs' * * shall mean any of the following, whether produced directly or indirectly by extraction * * * or independently by means of chemical synthesis, or by a combination of extraction and chemical synthesis:

(1) Opium, * * * and opiate;

(2) Any compound, manufacture, salt, derivative, or preparation of [the above];

(3) Any substance * * * which is chemically identical with any of the substances referred to in clauses (1) and (2)."

Does Percodan fall within such definition?

Appellant states:

"Both experts were of the opinion that the combination of A.P.C. (aspirin, phenacitin and caffeine) with 'dihydrohydroxycodeinone hydrochloride,' (commonly called 'codeinone') created in Percodan a narcotic drug [but differed as to what "codeinone" was]."

Appellant also points out "codeinone" composed only one per cent of the Percodan tablets, and that prior to September 1, 1965, Percodan could be dispensed in California without a narcotic prescription.

The trial judge originally stated he would permit the jury to determine if Percodan was or was not a narcotic drug under the federal laws, but later instructed the jury as a matter of law that "Percodan is a narcotic drug, or contains a narcotic drug." (R.T. 217.) Counsel for appellant objected, which objection was overruled.

Appellant urges that this change in theory prevented him from arguing the case to the jury effectively, he having raised the factual question in his argument to the jury of whether Percodan was in fact a narcotic drug. He did so argue, basing it on the small percentage of codeinone in the Percodan. He asserts this change of position was (a) the the equivalent of striking "from the indictment the reference to Percodan, so that proof of the importation of any narcotic drug would satisfy the requirements of conviction," and (b) denied appellant's right to a trial by jury.

We cannot agree. The undisputed evidence in the case was that the twenty-nine smuggled tablets were Percodan; that at least one per cent of Percodan was and is "codeinone;" that codeinone is not a "natural" derivative from opium (such as morphine, codeine, thelamine, etc.), but is a "synthetic" derivative obtained when something is added to or taken from a natural derivative (such as heroin or codeine).

While counsel for appellant argued that one per cent of codeinone "was not enough to render the Percodan a narcotic drug," the one per cent was "a synthetic prohibited narcotic drug, usually derived from an opium alkaloid." (R.T. 93.)

And even if *this* Percodan was not derived from an opium alkaloid as a natural derivative, it would fall within § 4731 of Title 26 as an independent production of a prohibited drug by means of a chemical synthesis.

"Q. Whether it [dihydrohydroxycodeinone hydrochloride, the medically correct name for codeinone] is made by extraction or whether it is made by synthesis, or whether it is made by a combination of extraction and synthesis, it would be the same product?

"A. Yes, as long as it has the same chemical structure. It is just the starting material that is different." (R.T. 102.)

And because Percodan contains this one per cent of dihydrohydroxy-codeinone hydrochloride, Percodan is a narcotic. (R.T. 102–03, testimony of Expert Hill.)

"Q. So, in essence, Percodan is a derivative or a synthesization of a narcotic drug?

"A. Yes, sir." (R.T. 1145, testimony of Expert Salerno.)

Counsel for the government points up the difficulty with appellant's position:

"It is not clear from the argument of appellant's previous counsel whether or not he was attempting to convince the jury that there could be no conviction unless Percodan consisted of narcotics in its entirety, i. e., 100 per cent narcotics. If he was not attempting to do so, appellant could not have been prejudiced by the failure to inform him that the jury would be instructed that they could not find appellant guilty unless they found that Percodan was a narcotic drug or contained a narcotic drug. There would be no contradiction between the instruction and appellant's argument. * * *

* * * * * *

"On the other hand, if appellant was attempting to mislead the jury into believing that they could not convict if they found that only one per cent of Percodan was a narcotic drug, he was not prejudiced by the change in the instruction in question because his argument already was at loggerheads with another indisputably correct instruction which the Court had already announced that it would give:

'The government does not have the burden of proving that the quantity was as alleged in the indictment, but only that some measurable amount thereof was in fact involved as charged in the indictment.' [R.T. 187, 218]."

(Appellee's Brief, pp. 10–11.)

Besides the foregoing, it is arguable that the court never instructed the jury as a matter of law that "Percodan is a narcotic drug, or contains a narcotic drug," but that he instructed the jury that "one of the four elements *the government was required to prove* is that Percodan is a narcotic drug or contains a narcotic drug." (R.T. 217; emphasis added.) That is how he said he intended to instruct. (R.T. 189–90.) And that is how appellant's then counsel understood him. (R.T. 223–24.)

In any event, in view of the clear expert testimony, and the lack of any testimony, expert or otherwise, to the contrary, we find the drugs here attempted to be smuggled were a prohibited narcotic, and we find no reversible error.

The judgment of conviction on each count is affirmed.