**UNITED STATES of America,**
**Plaintiff,**

**v.**

**Thomas Marcelino ESPINOZA,**
**Defendant.**

**Crim. No. 12247.**

United States District Court,
S. D. California.

March 2, 1972.

Harry D. Steward, U. S. Atty., Catherine A. Chandler, Asst. U. S. Atty., San Diego, Cal., for plaintiff.

James M. Gattey, San Diego, Cal., for defendant.

## MEMORANDUM DECISION AND ORDER

GORDON THOMPSON, Jr., District Judge.

Defendant herein has moved the Court for an order suppressing certain physical evidence consisting of approximately four grams of heroin hydrochloride emitted from the stomach of the defendant at approximately 12:55 A.M. on the morning of October 11, 1971. This evidence was seized as a result of a warrantless arrest and search occurring on October 10, 1971, at approximately 10:50 P.M., as the defendant entered the United States from Mexico on foot at the port of entry at San Ysidro, California. An evidentiary hearing was conducted on February 7, 1972, at the conclusion of which the matter was taken under submission by the Court.

Thereafter, on February 9, 1972, the defendant, his counsel, and the United States Government, desiring to waive a trial by jury in this matter, executed the jury waiver which this Court approved after orally inquiring of the defendant, his counsel and Government counsel, of their desire so to do. Thereafter, the case was submitted on the facts elicited at the hearing on the motion to suppress evidence, together with a written stipulation executed by the defendant, defense counsel and the Government, and the matter was thereafter submitted to the Court for determination as to the guilt or innocence of this defendant.

## FACTS

The evidence established at the hearing on the motion to suppress revealed that Agents Walters and Holleron received information from a reliable informant that a Mexican male by the name of Thomas Espinoza, described as wear-

ing hornrim glasses and a blue coat, would be entering the United States from Mexico on foot at the port of entry at San Ysidro, California, carrying a quantity of heroin in his stomach. Inspector Walters testified that on October 10, 1971, at approximately 9:30 in the evening, he was present at the port at the pedestrian gate entrance when he observed defendant Espinoza and overheard him give a negative declaration as he attempted to enter the United States in the pedestrian lane. Defendant, who was known to Agent Walters, was then questioned as to what he was bringing from Mexico. His declaration was that he was bringing tortillas only. Agent Walters testified that the defendant appeared to be in an extremely nervous condition, shuffling about, and in his opinion, under the influence of something. Inspector Walters observed that the defendant was "well-tracked" and was a user of narcotics. Subsequently, a personal search of the defendant was conducted with negative results.

Agent Holleron, who has been a Senior Special Agent with the Treasury Department, Bureau of Customs, for a period of about 13 years, testified that at approximately 10:00 P.M. that same evening he had a conversation with the defendant at the port of entry at San Ysidro in the presence of Special Agent Dominic Aragona, and after advising defendant Espinoza of his rights, defendant stated that he was a user of narcotics and had taken his last fix about two weeks prior to that date. Agent Holleron testified that in his opinion the puncture wounds which appeared on the arms and hands of the defendant were less than two weeks old, were reddened, that the defendant appeared somewhat nervous, his eyes being pin-pointed, and that based thereon, Agent Holleron formed the opinion that the defendant was under the influence of a drug or narcotic and had a "shot" more recently than two weeks prior.

Agent Holleron further testified that Espinoza was the subject of a look-out based upon information received from a reliable informant who named Thomas Espinoza and who stated that he would come across the border at San Ysidro from Mexico carrying narcotics within his body. Agent Holleron testified that he could recall at least ten cases that the same informant had made for Customs, that in each of those cases the information proved to be reliable, resulted in arrests of the individuals involved, and in the majority of cases the information related to body cavity concealment of narcotics. Agent Holleron testified that in his opinion the information on this occasion received from an informant named by the Supervisory Customs Inspector was reliable.

Agent Holleron further testified that after a conversation with the defendant which lasted approximately 20 minutes, he was taken to the office of Dr. Paul Salerno for an examination; that Dr. Salerno was asked to perform a routine-type examination of defendant, checking his heartbeat, blood pressure, reflexes, arms, and eyes, to determine whether the defendant was under the influence of narcotics at that time. After conducting the examination requested by Agent Holleron, the testimony reflects that Dr. Salerno informed Agent Holleron that, in his opinion, defendant Espinoza was under the influence of a narcotic. Agent Holleron testified that he and Agent Aragona asked Dr. Salerno to conduct a body probe, which he did. The rectal probe proved to be negative and the agents then requested Dr. Salerno to perform an emetic-type probe, which was done.

Dr. Salerno testified that on October 10, 1971, at approximately 10:50 P.M., defendant was brought to his office in the custody of Agents Holleron and Aragona, and that Agent Holleron initially requested that he conduct a physical examination of Espinoza to ascertain the condition of the needle marks found on defendant's arms and whether the individual was under the influence of a narcotic drug. Dr. Salerno testified that his investigation revealed both old and recent venous scarring of Espinoza's

right arm, that the left arm showed scarring over the upper forearm, that the lower forearm and lateral wrist showed a two-inch scar, venous segment, with seven recently-made needle marks, that the blood pressure was 140 over 95, that the pulse rate was 130 per minute, that the pupils of the eyes were abnormally constricted with impaired responses to changes in illumination, that the pupillary diameter was two millimeters in the light and four millimeters in the darkness, and that the deep tendon reflexes of the lower extremities were abnormally hyperactive. Dr. Salerno, based upon said examination, stated that he formed the opinion that the defendant was "under the primary influence of a narcotic drug" and that he had also taken an amphetamine-type drug which tended to elevate the blood pressure and pulse rate and to some degree counteract the physiological effects of the narcotic drug on the body. The needle marks, according to Dr. Salerno, were made within the past several days, but not more than a week previous.

Dr. Salerno further testified that after he had examined the defendant and stated his opinion to the agents that then and only then did the customs agents ask that he conduct both a rectal probe and an examination to determine the contents of the defendant's stomach, which he did. He further testified that the rectal probe was performed in a medically-approved manner with negative results. Thereafter defendant was given a six-ounce 10% saline solution to induce vomiting. The doctor testified that the defendant agreed to swallow the solution, followed by an additional ten ounces of plain water in order to clear his stomach. The evidence shows that Dr. Salerno informed the defendant prior to the defendant's consent to swallowing the saline solution that the alternative would be the pumping of the stomach. After approximately 45 minutes, Dr. Salerno observed vomiting action, accompanied by re-swallowing maneuvers. The defendant was then requested to use a wooden tongue depressor in order to facilitate and encourage the vomiting. Subsequently, when defendant would remove the depresser in order to re-swallow the material expelled from the stomach, Dr. Salerno aided him in the use of the tongue depressor which resulted, according to the testimony, in a regurgitation from defendant's stomach of three rubber latex enclosed packets, later determined to be the heroin hydrochloride. Dr. Salerno testified that the only time that the defendant was handcuffed during the one hour and 55 minutes that he was present in the doctor's office was when he was brought in and when he was taken out, that he was not handcuffed during the interim and was cooperative throughout, displaying no anger or other untoward emotion. Dr. Salerno reiterated under cross-examination on several occasions that the body cavity searches of the rectum and stomach were made at the request and direction of Agents Holleron and Aragona.

Further evidence was introduced on the day of trial by way of stipulation that the substance brought into the United States by the defendant concealed in his stomach on or about October 10, 1971, was four grams of heroin. The defendant offered no evidence either at the hearing on the motion to suppress nor at the court trial which followed.

### MOTION TO SUPPRESS
*Personal Search of Defendant:*

The initial detention and questioning of the defendant as he approached the International Border from Mexico on foot, and when first observed by Inspector Walters, has as its basis the statutory authority of 19 U.S.C. § 482.[1]

---

1. "Any of the officers or persons authorized to board or search vessels may stop, search, and examine, . . . any vehicle, beast, or person, on which or whom he or they shall suspect there is merchandise which is subject to duty, or shall have been introduced into the United States in any manner contrary to law, . . . and if any such officer or other person so authorized shall find any mer-

■ It is not unreasonable for immigration and/or customs officers to detain, on mere suspicion, an entrant in order to conduct a routine investigation and a search of his luggage, vehicle, and personal effects. Henderson v. United States, 390 F.2d 805 (9th Cir. 1967). It must be remembered, however, that the Fourth Amendment rights of the individual extend to persons crossing the borders of this country. This is so because the Fourth Amendment protects people not places. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1967).

■■ In order to justify an intrusion into that reasonable expectation of privacy, there must be some justification for initiating a search. This justification may be reasonably anticipated when one approaches and attempts to cross an international border from a foreign country into the United States. Such routine inspections and detentions are not deemed unreasonable searches. Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925).

■ It must be remembered that "border searches" must be reasonable under all the circumstances. One approaching an international border does not normally contemplate that his Fourth Amendment right of privacy would be invaded to the extent that he would be required to expose to view his nude body or to subject his body cavities to search even under the most medically-approved circumstances. In order to justify what is commonly known as a personal or "strip search" initiated by customs officials at the port of entry, they must have "at least a real suspicion directed specifically to the person to be searched." United States v. Guadalupe-Garza, 421 F.2d 876 (9th Cir. 1970). That case defined "real suspicion" as "subjective suspicion supported by objective, articulable facts that would reasonably lead an experienced, prudent customs official to suspect that a particular person seeking to cross our border is concealing something on his body for the purpose of transporting it into the United States contrary to law." 421 F. 2d at 879. That court also stated that the "objective, articulable facts must bear some reasonable relationship to suspicion that something is concealed on the body of the person to be searched; otherwise, the scope of the search is not related to the justification for its initiation, as it must be to meet the reasonableness standard of the Fourth Amendment." *Id.* It was there indicated that subjective good faith alone on the part of customs officials, unsupported by such facts, would do violence to the protections afforded individuals under the Fourth Amendment.

■ Applying those standards to the case at bar, it is clear that Inspector Walters, as he observed defendant attempt to enter the United States from Mexico, had sufficient information upon which to detain the defendant and to question him relative to what, if anything, he was bringing into the United States. This is so because the defendant was the subject of a look-out based upon information received by customs officials of which Inspector Walters was aware. Inspector Walters testified that he had searched Espinoza on several prior occasions and was present in the customs office when he had seen the defendant patted down by other inspectors. After escorting him to the baggage room and patting him down for weapons, Inspector Walters noticed that defendant was shuffling around and appeared to be under the influence in that he was more nervous than he had ever noticed before. On observation of defendant's arms, Inspector Walters observed that he was "well-tracked" and that to his knowledge defendant was a user of narcotics.

chandise on or about any such vehicle, beast, or person, . . . which he shall have reasonable cause to believe is subject to duty, or to have been unlawfully introduced in the United States, whether by the person in possession or charge, or by, in, or upon such vehicle, beast, or otherwise, he shall seize and secure the same for trial."

Without question and based upon these facts, Inspector Walters not only had subjective suspicion based upon the information previously received as to this defendant, but that the information was supported overwhelmingly by the objective, articulable facts. Certainly there existed at this point "at least a real suspicion, directed specifically to the person to be searched." *Guadalupe-Garza, supra.*

Accordingly, the personal search of the defendant was justified by a real suspicion, directed specifically to defendant, that he was carrying contraband.

*Body Cavity Search:*

██ While many cases have indicated that visual inspection of the surface of the body in the anal area and elsewhere is permissible in a skin search, the intrusion into the body cavity must satisfy a more stringent test than that required for the so-called personal or skin search. Prior to such a search there must be a "clear indication" or "plain suggestion" of the presence of contraband concealed in the cavity. Rivas v. United States, 368 F.2d 703, 710 (9th Cir. 1966). Therein it was stated:

While we know of no accepted meaning of that term [clear indication] in law or as a word of art, it can be readily defined. "Indication" is defined as "an indicating; suggestion." "Clear" is defined as "free from doubt;" "free from limitation;" "plain."

While *Rivas* requires that there must exist facts creating a "clear indication," or a "plain suggestion," of the smuggling, it is not necessary that those facts reach the dignity of, nor be the equivalent of, "probable cause" which is necessary for an arrest and search at a place other than a border.

*Rivas* held that a "clear indication" existed when a convicted registered user of narcotics crossed the border under the influence of narcotics, as indicated by his eyes, an extremely nervous manner, and recent needle marks on both

arms. The court stated that it is "required as a fact of life to recognize that many people crossing the border, desiring to smuggle goods, and more particularly narcotics, do, and unless stopped, will continue to utilize body cavities, including any of an adequate size that will make such smuggling economically profitable." 368 F.2d at 710.

The threshold question, then, is did the customs officials have a "clear indication" that smuggling was taking place by use of the body cavity of defendant, thus justifying a search of the defendant as he crossed the border; or, did the search violate the Fourth Amendment rights of the defendant herein?

The Court finds that the customs officials did have a "clear indication" or "plain suggestion" that the body cavity of the defendant concealed contraband. The information given Agents Walters and Holleron which caused the defendant to be the subject of a look-out not only was detailed and reliable, but proved precisely accurate in every respect within the ambit of their perception short of the actual body cavity intrusion. Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959). The objective, articulable facts observed by the officers confirmed the information received. In order to confirm the information relative to the defendant's stomach, the customs officials, acting out of an abundance of caution, transported the defendant to the offices of Dr. Salerno where the latter performed a medical examination to determine whether or not the information received and the observations made by the customs officials were accurate. This examination was conducted at the request of the customs officials. Having confirmed by medical diagnosis their own observations and the information previously received, the customs officers requested and instructed Dr. Salerno to perform a body probe, including first a rectal probe, then followed by the administering of an emetic.

This is not a *Rochin* situation with its physical assault on the defendant, both

before the stomach pumping and at the time of its occurrence. It was the physical assault in *Rochin* which caused the reversal. Here the evidence shows a technical physical assault but no degrading or shameful physical assault upon the person in the sense the Supreme Court found in Rochin v. California, 342 U.S. 165, 72 S.Ct. 1205, 96 L.Ed. 183 (1952).

Defendant argues at length that the motion to suppress should be sustained on the authority of Huguez v. United States, 406 F.2d 366 (9th Cir. 1968). The thrust of defendant's argument is that Dr. Salerno, acting in the capacity in which he was in this case, lacked a "clear indication" or "plain suggestion" of the presence of the contraband concealed in the cavity, because he did not have the prior information relayed to the customs officers from the reliable informant at the time he conducted the probe. With that proposition, this Court disagrees.

*Huguez* is readily distinguishable from the case at bar in several respects:

*First:* In *Huguez*, the customs officers who escorted the defendants therein to the baggage area (not a medical room) were not possessed of the information which would give rise to a "clear indication" of contraband concealed in the body cavity. In this case Agents Holleron and Aragona had such information.

*Second:* There was no confirmation of the previously acquired information in the *Huguez* case, while in the present case the confirmation of the information previously received from the reliable informant was in abundance both by the objective, articulable facts perceived by the customs officers and the defendant's own admission that he was a user of narcotics and had had his last fix about two weeks prior.

*Third:* The body cavity probe was conducted at the office of Dr. Salerno and not in an unhygienically, unsterilized baggage room at the port of entry.

*Fourth:* Here the examination was conducted at the specific request and direction of the customs agents only after medical confirmation of their own observations and the defendant's admissions, while in *Huguez* it was the doctor who made the request to probe the body cavity.

*Fifth:* In *Huguez*, there was a substantial and excessive use of force in the probing of the body cavity; there was no such evidence in this case.

It seems to the Court that this case parallels the *Rivas* case in substantially all of the facts and circumstances known to the customs officers which gave rise to the "clear indication" or "plain suggestion" that the defendant was smuggling contraband into the United States in a body cavity. Added thereto is the information from a reliable informant, the accuracy of which is indisputable, which included the fact that the defendant was carrying the contraband in his stomach. Additionally, the defendant admitted to being a narcotics user and having "fixed" approximately two weeks prior to his border crossing. At this point it can clearly be said that not only was there a "clear indication" of contraband being smuggled across the border, but in fact probable cause existed for the defendant's arrest even before the body cavity probe began. Draper v. United States, *supra*. Certainly if there was probable cause to arrest, there was "clear indication" and "plain suggestion" that defendant was carrying narcotics within his body, thus allowing the body cavity search.

In the opinion of this Court had the customs officials acted in any other manner than they did in an effort to secure the contraband from the body cavity of the defendant, they would have acted unreasonably and in dereliction of their duty. There was not here present a violation of the Fourth Amendment rights of the defendant.

Accordingly, the motion to suppress is denied.

## VERDICT OF THE COURT

 Based upon a review of the facts set forth above, it is the verdict of the Court that the defendant, THOMAS MARCELINO ESPINOZA, is guilty as charged of the illegal importation of a controlled substance in violation of 21 U.S.C. §§ 952, 960, and 963.