**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Kenneth Malcolm CAMERON,**
**Defendant-Appellant.**

**No. 75–2030.**

United States Court of Appeals,
Ninth Circuit.

June 21, 1976.

Nelson P. Brav (argued), Brav & Schwartz, San Diego, Cal., for defendant-appellant.

Robert D. Krause, Asst. U.S. Atty. (argued), San Diego, Cal., for plaintiff-appellee.

## OPINION

Before HUFSTEDLER and KENNEDY, Circuit Judges, and THOMPSON,* District Judge.

ANTHONY M. KENNEDY, Circuit Judge:

Appellant Kenneth Cameron was tried by the district court on stipulated facts and found guilty of importing a controlled substance in violation of 21 U.S.C. §§ 952, 960 & 963. The sole issue at trial and on this appeal is the admissibility of evidence discovered in a search of the defendant's rectal cavity, under the circumstances described below.

On November 11, 1974, the appellant attempted to enter the United States from Mexico at the San Ysidro, California port of entry. He was stopped by customs inspector Harmon, who ascertained that Cameron's vehicle was listed on the customs bureau's computer as one requiring special attention. The inspector asked appellant about citizenship and importation, and in so doing noted that his eyes were "pinpointed" and that his speech was slurred. Inspector Harmon directed Cameron to drive to the secondary inspection area. Upon checking appellant's arms for needle marks and discovering several, including a mark estimat-

---

* Honorable Bruce R. Thompson, United States District Judge for the District of Nevada, sitting by designation.

ed to be approximately one hour old,[1] Inspector Harmon concluded that appellant was "definitely" under the influence of narcotics.

Harmon thereupon received permission from his supervisor, Inspector Gaudur, to conduct a visual body search, sometimes called a strip search. Harmon discovered no contraband, but observed clear signs of vaseline or other lubricant in appellant's rectal area. The inspector inferred from all of the foregoing that Cameron was carrying contraband, concealed in his rectal cavity.[2] Inspector Gaudur confirmed Harmon's observations and noted that appellant was nervous and looked scared. Gaudur requested that Cameron spread his buttocks for more detailed visual inspection, but Cameron would not comply.

Inspector Gaudur called Assistant United States Attorney Thomas Coffin by telephone to request authorization for a body cavity search. Coffin ascertained that Cameron was free on bond while awaiting trial on charges of importing a controlled substance several months earlier.[3] Coffin determined that a judge of the Southern District of California had advised Cameron that very morning of the conditions of his bond, including a prohibition on travel to Mexico. Coffin thereupon instructed Inspector Gaudur to detain the appellant for violation of his bond, regardless of whether any contraband was found,[4] and further authorized Gaudur to conduct a body cavity search.

The agents took Cameron to the community hospital at Chula Vista, California and authorized Dr. Richard Boyd to perform an internal body search for concealed contraband. Dr. Boyd commenced by giving appellant a general physical examination, and observed nothing unusual. Cameron stated that he had abdominal and rectal problems and had been taking some medication for them, but he refused to elaborate when the doctor questioned further.

An initial probe of the rectal cavity by Dr. Boyd was frustrated by appellant's resistance.[5] Dr. Boyd attempted a second probe and appellant again complained and offered sharp physical resistance. Two customs officers subdued Cameron. They forced his legs against his chest until Dr. Boyd successfully completed the probe. Dr. Boyd determined a foreign object was concealed in Cameron's rectum, but was unable to remove it.

Dr. Boyd rejected the possibility of using a proctoscope or sigmoidoscope in removing the object since these instruments cannot be used safely without the patient's cooperation. Instead he ordered a warm water enema, and it was administered by a nurse under the doctor's supervision. Appellant loudly objected, complained of pain, and had to be restrained with force by the customs agents. A second enema was administered approximately 15 minutes later, under the same conditions. Neither enema caused the contraband to be flushed from appellant's body.

Dr. Boyd was replaced at midnight by Dr. Groves. Approximately one or two hours later, she prescribed an oral laxative to speed up appellant's processes of elimina-

1. Inspector Harmon testified that he had been a law enforcement officer for over five years, including nearly one year with the Customs Service, that he had received training to determine the relative age of needle marks, and that he examined the arms of known narcotics addicts three or four times a week.

2. Officer Harmon based this conclusion on his experience with the "many body plants [discovered] at the port." He explained that a lubricant is frequently used to facilitate the insertion of the plant into a body cavity.

3. Appellant was subsequently found guilty of charges stemming from this earlier incident.

In a memorandum issued this date, *United States v. Cameron*, No. 75–2029, we have affirmed that conviction.

4. Coffin immediately telephoned a federal magistrate and informed him of the circumstances of the suspected bond violation and the latter confirmed the order detaining Cameron.

5. Dr. Boyd testified that a proper examination required the subject to lie on his side, with his knees pulled to his chest. Cameron's action of straightening out his legs made continuation of the probe impossible.

tion. Appellant refused to drink it, and stated that because of his history of abdominal difficulty he should not take medicine without consulting his own physician. Appellant was told he would have to swallow it, and when he refused, an attempt was made to pour it down his throat: several customs officers held his arms and legs, and his head was pushed back, forcing his mouth open. Appellant then acquiesced and drank the medicine. He was left alone and went to sleep.

Cameron was then awakened at 4:00 a.m. and taken back to the port of entry. Later that morning he was transported to the marshal's office in San Diego where he arrived about 10:30 a.m. Approximately 45 minutes later he requested to use the toilet. When he finished, a condom containing heroin was found in the previously empty commode.

*The Justification for Initiating the Search*

Appellant first argues the heroin should be suppressed because there was no justification for initiating the search which led to its discovery. We cannot agree. We find that at every step of the way law enforcement officers were aware of sufficient, concrete, articulable facts to justify further inquiry and, ultimately, a search.

█ It is settled that certain border searches may be conducted even absent any suspicion of wrongdoing. *Carroll v. United States,* 267 U.S. 132, 154, 45 S.Ct. 280, 69 L.Ed. 543 (1925). Detailed questioning of appellant in the secondary search area and a physical examination of his arms were proper under this rule.

█ But we have further held that searches involving a "serious invasion of personal privacy and dignity," such as close scrutiny of intimate portions of the body, may proceed only when there is a clear

indication or plain suggestion that the individual may be involved in the importation of contraband. *Henderson v. United States,* 390 F.2d 805, 808 (9th Cir. 1967); *see Rivas v. United States,* 368 F.2d 703, 710 (9th Cir. 1966), *cert. denied,* 386 U.S. 945, 87 S.Ct. 980, 17 L.Ed.2d 875 (1967). In this case the following facts were fully sufficient to constitute a plain indication that appellant was smuggling narcotics and to justify a visual scan of the body: the computer identification of appellant's automobile, *see United States v. Carter,* 480 F.2d 981, 983 (9th Cir. 1973); indications of narcotic influence from Cameron's pinpointed eyes, slurred speech, and recent needle marks, *United States v. Velasquez,* 469 F.2d 264, 265–66 (9th Cir. 1972), *cert. denied,* 410 U.S. 945, 93 S.Ct. 1399, 35 L.Ed.2d 612 (1973); *United States v. Shields,* 453 F.2d 1235, 1236 (9th Cir.), *cert. denied,* 406 U.S. 910, 92 S.Ct. 1615, 31 L.Ed.2d 821 (1972); *United States v. Summerfield,* 421 F.2d 684, 685 (9th Cir. 1970).[6]

The subsequent discovery of the following additional factors warranted the conclusion that narcotics might be concealed in the suspect's rectal cavity: the discovery of grease or lubricant in appellant's rectal area, as verified by a second experienced customs officer, *see United States v. Velasquez, supra,* 469 F.2d at 266; *United States v. Sosa,* 469 F.2d 271, 272 n.1, 273 (9th Cir., 1972), *cert. denied,* 410 U.S. 945, 93 S.Ct. 1399, 35 L.Ed.2d 612 (1973); the determination that the suspect had been charged with a similar offense on a previous occasion and had violated his bond by traveling to Mexico, *see Rivas v. United States, supra,* 368 F.2d at 710.

*Government Conduct in Executing the Search*

█ Finding the existence of sufficient cause, however, does not end our inquiry

---

**6.** As we have noted in previous cases, the "plain suggestion" or "clear indication" test necessitates the existence of something more than a mere suspicion, but somewhat less than probable cause. *Henderson v. United States,* 390 F.2d 805, 806–07 (9th Cir. 1967); *Rivas v. United States,* 368 F.2d 703, 710–12 (9th Cir.

1966), *cert. denied,* 386 U.S. 945, 87 S.Ct. 980, 17 L.Ed.2d 875 (1967). Since heroin is easily available, and relatively cheap in Mexico, the attempted entry by one who is a current user of narcotics raises a sufficiently strong inference that he is concealing such contraband to warrant a strip search.

under the fourth amendment. We have held that in determining whether a search comports with the requirements of the fourth amendment "[t]he scope of the particular intrusion, the manner of its conduct, and the justification for initiating it must all be considered." *United States v. Guadalupe-Garza,* 421 F.2d 876, 878 (9th Cir. 1970). Thus a clear indication that the suspect is concealing contraband does not authorize government officials to resort to any and all means at their disposal to retrieve it. Indeed, the fourth amendment imposes a stricter standard on the "means and procedures" of a body search than does the due process clause. *Compare Schmerber v. California,* 384 U.S. 757, 768, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), *with id.* at 759–60, 86 S.Ct. 1826; *Blackford v. United States,* 247 F.2d 745, 749–51 (9th Cir. 1957), *cert. denied,* 356 U.S. 914, 78 S.Ct. 672, 2 L.Ed.2d 586 (1958). Any body search, if it is to comport with the reasonableness standard of the fourth amendment, must be conducted with regard for the subject's privacy and be designed to minimize emotional and physical trauma.

■ In addition to the fears and anxieties harbored by most suspects, the person accused of concealing contraband within his body is faced with the real prospect that the most intimate portions of his anatomy will be invaded and that he will suffer resulting pain or even physical harm. As in the case before us, the suspect usually faces this ordeal without assistance, surrounded by persons who administer the procedure on behalf of the government and thus appear to him to have as their overriding motive the obtaining of evidence to convict, and not his personal well being. In a situation thus laden with the potential for fear and anxiety, a reasonable search will include, beyond the usual procedural requirements, reasonable steps to mitigate the anxiety, discomfort, and humiliation that the suspect may suffer. Since we find that the procedures here employed were lacking in these

respects, we hold that the search violated the fourth amendment.

Cameron was subjected to two forced digital probes, two enemas, and forced to drink a liquid laxative. Execution of these several, intrusive procedures, enduring through the better part of one night, is sufficient to bring in question the propriety of the search.

Moreover, less intrusive means of obtaining the evidence may properly have been considered. In time, the contraband in the rectal cavity might have been eliminated naturally. *See Blackford v. United States, supra,* 247 F.2d at 754–55 (Stephens, J., dissenting). A federal magistrate had ordered Cameron held for violation of his bond, so Cameron could have been confined and observed for recovery of the drugs.[7]

Finally, even if one were to assume a search of this extent was justified here, we find that the government agents did not take reasonable steps to allay the anxieties and concerns of the suspect. These medical procedures were initiated without careful consideration of Cameron's claim that he was under medical supervision for stomach and rectal problems. No doctor was present when the liquid laxative was administered.

■ In evaluating the reasonableness of the manner in which the search was conducted, we consider that the government failed to obtain a warrant. The law of this circuit, although it has often provoked dissents, is that there is no per se requirement for a warrant to conduct a body search in border crossing cases. *United States v. Mason,* 480 F.2d 563, 564 & n.1 (9th Cir.), *cert. denied,* 414 U.S. 941, 94 S.Ct. 246, 38 L.Ed.2d 167 (1973); *Rivas v. United States, supra,* 368 F.2d at 710–11. But we have noted the failure to obtain a warrant in the course of determining such a search to have been conducted in an unreasonable manner. *Huguez v. United States,* 406 F.2d 366, 374– 79 (9th Cir. 1969).

7. The fact that Cameron was otherwise ordered held in custody only underscores the availability of this alternative. We do not imply that a person suspected of importing contraband can-

not be held in custody for the length of time necessary to conduct all reasonable search procedures.

In addition to certifying that a search is reasonably justified, a warrant can also assure that it is conducted in a reasonable manner. Appellant in this case strongly and consistently protested the illegality of the procedures. In such circumstances his fear that the procedures were not totally lawful is understandable. A warrant can dispel such apprehensions. It advises the suspect that authorization for the search has been obtained from a judicial officer, and hence that the search is presumptively lawful. The warrant defines the scope of the search, so that the suspect will know what procedures he faces. A warrant serving these purposes may well secure the cooperation of an otherwise reluctant suspect, thus rendering the search less painful.

■ Further, in this case there was no emergency requiring instant seizure of the evidence. Compare *Schmerber v. California, supra*, 384 U.S. at 770–71, 86 S.Ct. 1826.[8] It should not have been difficult to obtain a warrant, for the United States magistrate and the United States Attorney had already been called as to other aspects of the case.[9] We do not hold that a warrant must be obtained prior to all body cavity searches. However, the absence of a warrant is an important factor in assessing the reasonableness with which the authorities acted.

These considerations suffice to dispose of the case before us. We are, however, troubled by the recurring nature of the question here presented. We have noted elsewhere that thousands of people cross our borders every year and that of course the overwhelming majority do not carry contraband. *Henderson v. United States, supra*, 390 F.2d at 808. Each is potentially exposed to search constituting a serious affront to bodily integrity and personal dignity. The fact that the affront can take the dimensions of that perpetrated upon the appellant in this case underscores the seriousness of the problem. We are also aware that narcotic peddlers will not hesitate to pervert their own bodies to smuggle drugs into this country. Such practices would be encouraged if the customs service were not allowed to conduct an adequate detection program.

In deciding the instant matter, we were somewhat limited in our inquiry by the unavailability of data on body cavity searches in border crossing cases. Government counsel stated at oral argument that he did not have such information. Because of the serious interests implicated on both sides, the agency in charge of conducting the searches and the United States Attorney should closely scrutinize the incidence, extent, and rate of success of these searches. It is disturbing indeed to note that the success rate for body cavity searches may be as low as 15 or 20 percent. *See Morales v. United States*, 406 F.2d 1298, 1300 n. 2 (9th Cir. 1969). *See also United States v. Guadalupe-Garza, supra*, 421 F.2d at 879 n.2, 880 n.4 (fewer than one out of three persons subjected to strip searches found to carry contraband). It may well be that excesses in both the incidence and the extent of body searches are inherent in the manner in which the agency conducts its procedures. If that is the case, this would be highly relevant in weighing the effect of failure to obtain a warrant in any particular case.

We suggest that the agency keep careful statistics henceforth and make them available to the United States Attorney. Information on the incidence of body cavity searches and what contraband, if any, is recovered in each case is necessary if we are to be fully advised in determining whether

---

**8.** There were no facts on the record indicating that failure to remove the heroin would constitute a danger to the suspect. In any case, since the suspect himself would have been responsible for any such risk, only a showing of the greatest imminent harm would justify intrusive action for the purpose of removal of the drug.

**9.** *See* note 5 *supra*. This case further illustrates the kind of assistance that a careful magistrate might give. The magistrate here may have considered the alternative methods for a search and, upon being alerted to the suspect's claimed medical problems, inquired further into that matter. Additionally, a magistrate might have considered requiring a doctor's report upon return of the warrant.

to adhere to the rule that a warrant is not a per se requirement in body search cases.

REVERSED AND REMANDED.

BRUCE R. THOMPSON, District Judge (concurring).

I concur in the opinion only because of the special circumstance in this case which permitted defendant to be lawfully held in custody for reasons unrelated to the detention for the body cavity search. There was no emergency. If the independent ground for retention in custody had not existed, I would think it incumbent on the officers to complete the search with dispatch.