UNITED STATES of America,
Plaintiff-Appellant,

v.

Joseph Mark COUCH,
Defendant-Appellee.

No. 80–1524.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 4, 1981.

Decided May 6, 1982.

As Amended Sept. 24, 1982.

Brad D. Brian, Asst. U.S. Atty., Los Angeles, Cal., for plaintiff-appellant.

Andrew H. Parnes, Nolan, Constantinides & Parnes, Palo Alto, Cal., argued, for defendant-appellee; Thomas J. Nolan, Jr., Palo Alto, Cal., on brief.

Before BOOCHEVER and NORRIS, Circuit Judges, and VOORHEES,* District Judge.

BOOCHEVER, Circuit Judge.

This case requires us to evaluate the border detention of an individual suspected of carrying illicit drugs within his body. Joseph Mark Couch was indicted for importation and possession of cocaine. Prior to trial, he moved to suppress x-rays of his abdominal region, and the cocaine eventually retrieved from his digestive system. The district court granted his suppression motion, finding that Couch's airport detention of over nine hours was unreasonable, and that the affidavits supporting a court-ordered x-ray examination were insufficient to establish probable cause. The government appeals the suppression order, and we reverse.

FACTS

On March 4, 1980, the Drug Enforcement Administration (DEA) notified agent Donald Souza of the Los Angeles office of the Customs Service that several people would be attempting to smuggle cocaine into the United States from Lima, Peru by concealing the drug in their stomachs. The DEA received its information from a previously reliable confidential informant. One of the individuals mentioned in the scheme was the defendant and appellee, Joseph Couch.

The informant gave a specific description of the smuggling scheme. Couch and the other individuals would take a laxative to clean out their systems, swallow several capsules of cocaine, and then take a drug that inhibited the normal digestive process. Once the smugglers reached their destination, they were to take another laxative and retrieve the cocaine. The informant also stated that the trip reservations were made at a Menlo Park, California travel agency, that the tickets were paid for with cash, and that the individuals would return to the United States during the week of March 3, 1980. Finally, the informant stated that when Couch had been detained by Peruvian customs officials on an earlier trip in December, 1979, he had avoided an x-ray examination by claiming that he had previously been overexposed to x-rays and feared further exposure. The informant did not state how the information was obtained.

Based on this information, Souza notified customs inspectors at Los Angeles International Airport to watch for the individuals, but did not begin to prepare an affidavit or take any steps to secure a warrant. At 7:30 a.m. on March 5, 1980, Couch and his traveling companion Robert Ek arrived at the airport and were detained by DEA agents and customs officials. The officials notified Souza of the detention by radio, and he proceeded to the United States Attorney's office to prepare an affidavit to support a court-ordered x-ray search of Couch and Ek.

The customs agents individually informed Couch and Ek that they were suspected of smuggling narcotics and took them to a secondary area. At this point the suspects

---

* The Honorable Donald S. Voorhees, United States District Judge for the Western District of Washington, sitting by designation.

were separated. The agents searched Couch's baggage and person but did not find narcotics or any indicia of smuggling. Couch refused to consent to a voluntary x-ray examination of his abdominal area, explaining that he had been previously overexposed to x-rays and felt that further exposure would be harmful to his health. Thereafter Couch was taken to the DEA office in another part of the airport, and was told he would be detained until the agents could obtain a court order for an x-ray examination.

Agents detained Couch in the DEA office from approximately 9:00 a.m. until 5:00 p.m., when he was handcuffed and taken to a nearby hospital for x-rays. During this period, the DEA agents informed Couch of his *Miranda*[1] rights, but refused several requests for an attorney, informing Couch that he was not entitled to one.[2] Couch was kept under constant surveillance, was not permitted to make any phone calls, and knew he was not free to leave. Furthermore, two DEA agents questioned Couch, asking him several routine questions as well as what he was doing in Peru and whether he was carrying drugs. During questioning, Couch explained that his fear of x-rays stemmed from overexposure during his previous employment at General Electric and at a hospital. Later in the afternoon, an investigation indicated that neither employer had any record of Couch's employment, but Couch basically stuck to his story. The agents offered Couch food and water, which he refused.

During Couch's detention, Souza and a United States Attorney worked from 10:00 a.m. until 3:00 p.m. preparing a three and one-half page affidavit, reciting all of the information provided by the confidential informant. The following additional information, obtained since Couch's arrival, was also included: Couch and Ek had arrived at 7:30 a.m. on a flight from Peru; the initial search proved negative; Couch had refused to submit to an x-ray for alleged health reasons; and at 2:30 p.m. a call to the airport confirmed that Couch had refused any food and had not urinated or defecated since arrival. At 4:30 p.m., a magistrate issued a court order authorizing x-rays of Couch and Ek, conducted "in a reasonable manner" by a doctor at a local hospital.

After Couch was taken from the airport to the hospital, he was shown the court order and told that he would be forced to comply if he did not voluntarily submit to the procedure. Couch again explained his fears about x-ray exposure and requested an attorney, but signed a consent form for the x-rays. Several x-rays were taken, which revealed foreign objects in Couch's stomach. Couch was then formally arrested, and transferred to another hospital for observation. Over the next several days Couch excreted a total of thirty-six capsules, containing 181.2 grams of cocaine.

Couch and Ek were indicted for importing cocaine in violation of 21 U.S.C. §§ 952(a) and 960(a)(1), and possessing cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1). Separate trials were scheduled for the defendants.[3] Prior to trial, Couch filed a motion to suppress all evidence obtained from the detention, and all evidence from the court order, including the x-rays and the cocaine. Couch argued that the detention was illegal because it was, in effect, an arrest without probable cause, that the affidavit supporting the court order was insufficient, and that the use of an x-ray examination was unreason-

---

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

2. In Couch's declaration in support of the motion to suppress, he states: "I again asked for an attorney, but agents refused, stating that I was not entitled to one because I was not under arrest." The agents apparently thought that Couch was requesting appointment of counsel, but Couch asserts that he merely wanted to contact an attorney.

3. Ek was tried before District Judge Kelleher, who denied Ek's pretrial suppression motion. Although Couch and Ek were held in separate detention rooms at the airport, it appears that the circumstances of their detentions were similar. Ek's conviction was affirmed by another panel of this court. *United States v. Ek,* 676 F.2d 379 (9th Cir. 1982).

able. After an evidentiary hearing, District Judge Hatter granted Couch's motion in a minute order. The court did not enter written findings of fact, but the transcript of the suppression hearing indicates that the court based its order on the unreasonable length and nature of the detention, and the insufficiency of the affidavit. The government appeals the suppression order to this court pursuant to 18 U.S.C. § 3731.

## I. *Reasonableness of the Detention*

When entering this country, persons are subject to routine searches without probable cause. *United States v. Ramsey,* 431 U.S. 606, 619, 97 S.Ct. 1972, 1980, 52 L.Ed.2d 617 (1977); *United States v. Perez,* 644 F.2d 1299, 1302 (9th Cir. 1981). Furthermore, the first United States location at which an international flight lands is considered the "functional equivalent" of the border, and the same standards apply as at the actual border. *Almeida-Sanchez v. United States,* 413 U.S. 266, 273, 93 S.Ct. 2535, 2539, 37 L.Ed.2d 596 (1973). Couch's flight was non-stop from Lima, Peru to Los Angeles International Airport; thus, the initial detention and search, conducted in a reasonable manner, do not present any constitutional issues.

Couch argues that his extended detention, between the time of the initial search and execution of the court-ordered x-ray examination over nine hours later, was in effect an arrest requiring probable cause, citing *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). In *Dunaway,* a suspect was taken to a police station and questioned about a crime. He made incriminating statements. The Court held that the detention for the purpose of custodial interrogation was illegal where the police did not have probable cause to arrest. 442 U.S. 200 at 212–13, 99 S.Ct. at 2256–2257, 60 L.Ed.2d 824. *Dunaway* makes it clear that courts must distinguish between brief investigatory stops based on reasonable suspicion, and arrests requiring probable cause. *Terry v. Ohio,* 392 U.S. 1, 21–22, 88 S.Ct. 1868, 1879–1880, 20 L.Ed.2d 889 (1968).

Although *Dunaway* is a useful starting point, it does not directly control the instant case. First, *Dunaway* stressed that the objectional feature of the suspect's detention was custodial interrogation; the Court suppressed the suspects' incriminating statements. 442 U.S. at 216, 99 S.Ct. at 2258. In the instant case, although Couch was asked some questions, the purpose of the detention was to secure a warrant, not to elicit information. Second, the detention in this case occurred at the border. Government agents are given considerably more leeway at the border. *United States v. Erwin,* 625 F.2d 838, 841 (9th Cir. 1980). We must therefore analyze the nature of Couch's detention in light of the border search standards developed in this circuit.

In *United States v. Cameron,* 538 F.2d 254 (9th Cir. 1976), this court held a suspect's slurred speech, needlemarks and lubricant in the rectal area provided the necessary "clear indication" for a body cavity search, but nevertheless found that the particular search was conducted in an objectionable manner. *Id.* at 257–58. In dictum, the court stated that the Ninth Circuit rule is that warrants are not required for a body cavity search, but expressed a strong preference for a warrant. 538 F.2d at 258–59. *See* 3 W. LaFave, *Search & Seizure* § 10.5, at 292–93 (1978). The court noted that it would be permissible to detain a suspect while a warrant was obtained. 538 F.2d at 258 n. 7.

On the other hand, this court recently held that a two and one-half hour detention at a Border Patrol check point was unreasonable, and reversed the resulting narcotics conviction. *United States v. Perez-Esparza,* 609 F.2d 1284 (9th Cir. 1979). The court relied heavily on *Dunaway,* finding that the suspect was delayed for the purpose of custodial interrogation, not for the purpose of obtaining a warrant. *Id.* at 1287. The *Perez-Esparza* court also suggested that its holding was based in part on the fact that the agents did not have a valid justification to detain the suspects. *Id.* at

1287 n. 2.[4] In any event, *Perez-Esparza* is not on point because a search at a Border Patrol check point is not the functional equivalent of a border search. *United States v. Morgan,* 501 F.2d 1351 (9th Cir. 1974) (en banc) (per curiam).

The case closest to the instant case is *United States v. Erwin,* 625 F.2d 838 (9th Cir. 1980), which was decided after Couch's suppression hearing. In *Erwin,* airport customs agents became suspicious of a passenger whose restricted movements and luggage contents indicated body cavity smuggling. After the suspect refused to submit to a strip search, she was detained seven hours while a court order for a strip search and x-ray examination was obtained. Erwin challenged her heroin conviction on the ground that the seven-hour detention was an illegal arrest within the meaning of *Dunaway* and *Perez-Esparza.* The *Erwin* court rejected this argument, holding that the detention while a warrant was obtained was reasonable. *Id.* at 841. The court suggested that it would be inconsistent to express a preference for warrants, as in *Cameron,* but to hold that detention pending a warrant was unreasonable.[5]

■ There is an arguable distinction between *Erwin* and the circumstances of Couch's detention. Erwin was detained only after a search of her luggage revealed items commonly used in body cavity smuggling, and her restricted body movements bolstered the customs agents' suspicions. Suspicion focused on Couch before his plane landed. The initial search did not reveal anything incriminating. Because an infor-

mant's tip rather than the fruits of an airport search was the basis for detention, Couch argues that the agents should have either applied for a warrant before his arrival, or prepared affidavits ahead of time and applied for a telephone warrant after the tip was verified upon his arrival. Fed. R. Crim. P. 41(c)(2). Couch contends that the purpose of his extended detention was to obtain evidence before the warrant was procured, either through questioning or eventual excretion of the capsules.

Although detention pending a warrant may be more reasonable when suspicion arises after arrival, as in *Erwin,* we are not prepared to make the constitutional distinction urged by Couch.[6] The reason that the initial search of Couch did not indicate smuggling was that the ingestion method does not leave external signs of smuggling. By contrast, the method of smuggling used in *Erwin* often results in restrictive body movements, items such as condoms and lubricants in the luggage, and traces of lubricant on the outside of the body. *See United States v. Purvis,* 632 F.2d 94, 95 (9th Cir. 1980); *Erwin,* 625 F.2d at 840; *United States v. Aman,* 624 F.2d 911, 912 (9th Cir. 1980). We decline to afford the smuggling method used by Couch more protection merely because it is more concealable than Erwin's method. We find that *Erwin* controls and the detention here was reasonable.

Moreover, we are not convinced that it would have been preferable for the agents in this case to apply for the warrant ahead of time, or arrange for a telephonic war-

---

4. By contrast, the agents' justification for detaining Couch in this case was to preserve the status quo while they obtained a court order, a practice approved in dictum by the *Cameron* court. 538 F.2d at 258 n. 7.

5. We need not reach the issue of whether the defendant could have complained had the agents detained him until his own bodily processes had cleared his digestive tract of its contents. That process might have taken as long as two or three days. The means chosen by the agents of seeking a court order authorizing the taking of x-rays caused defendant to be detained a considerably shorter period of time than he would have been detained had the

agents chosen the alternative, but arguably permissible, method of determining what was in fact within his digestive tract.

6. Couch also argues that *Erwin* is distinguishable because the total time of Erwin's detention was less than his own. Although it was close to twelve hours from the time Couch's airplane landed until his formal arrest, we measure the detention from 9:00 a.m., when the secondary search was completed, until 4:30 p.m. when the agents obtained the court order. We do not find any constitutional significance to the difference between this time period and the seven hours Erwin was detained.

rant.[7] Prior to Couch's arrival at the airport, agent Souza only had information that Couch would be arriving from Peru sometime during the week, with cocaine concealed in his stomach. Souza could not be sure that Couch would not alter his plans or whether the uncorroborated information from the confidential informant would be sufficient to obtain a court order. After Couch's arrival, several important details of the informant's tip were corroborated, notably that Couch and Ek had arrived from Peru and refused x-ray searches for health reasons. In addition, the agents may have considered that the parties might consent to an x-ray search, thus obviating the time and effort required to obtain a court order.

As a final factor in evaluating the reasonableness of the detention, we consider the customs agents' denial of Couch's specific requests for counsel.[8] We note initially that application for a court order is an *ex parte* proceeding in which neither the subject of the order nor the subject's attorney has a right to participate. *United States v. Erwin*, 625 F.2d 838, 840 (9th Cir. 1980). *Erwin* further held that the suspect's attorney had no right to be present during the search. *Id.* Although Couch was not yet charged with a crime and was not entitled to appointed counsel, under other circumstances the failure to permit a telephone call and the denial of the right to consult with retained counsel could be decisive. Here, however, there was little of anything that counsel could have done to prevent the discovery of the incriminating

evidence. We find that the denial of counsel under the circumstances did not render the detention, which was otherwise permissible under *Erwin*, unreasonable. We are not confronted with the question of admissibility of any statements obtained after Couch requested counsel. Any such issue remains to be resolved if and when Couch is tried.

We therefore conclude that the district court, which did not have the benefit of the *Erwin* decision, clearly erred in finding that Couch's detention was unreasonable. In view of this conclusion, it is unnecessary for us to decide whether a less deferential standard of review is applicable.

## II. *Sufficiency of the Affidavit*

A border search may entail several levels of intrusion. The pat-down search of Couch and the search of his luggage were permissible with only a minimal showing of suspicion. *United States v. Ramsey*, 431 U.S. 606, 619, 97 S.Ct. 1972, 1980, 52 L.Ed.2d 617 (1977). *See United States v. Perez*, 644 F.2d 1299, 1302 (9th Cir. 1981). A "strip search" is only permissible upon a showing of "real suspicion." *United States v. Rodriguez*, 592 F.2d 553, 556 (9th Cir. 1979). A body cavity search is an even greater intrusion, requiring a "clear indication" that the suspect is carrying contraband in a body cavity. *United States v. Aman*, 624 F.2d 911, 912–913 (9th Cir. 1980). When the government agents have such a clear indication, a warrant is preferred but not required.[9] *Id.* In the companion case

---

**7.** In examining the testimony of agents Souza and Cathey, we do not find any indication of intentional delay. Souza went directly to the United States Attorney's office and worked on the affidavit with Cathey and assistant United States attorney Dwyer from 10:00 a.m. until 2:30 p.m. The agents encountered administrative difficulties, but obtained the magistrate's approval by 4:30 p.m.

**8.** Because Couch was not yet formally charged or indicted when his requests for counsel were denied, his Sixth amendment right to counsel was not violated. *Brewer v. Williams*, 430 U.S. 387, 398, 97 S.Ct. 1232, 1239, 51 L.Ed.2d 424 (1977). The record indicates that Couch was not free to leave, and officials asked him whether he was carrying drugs, thus implicat-

ing Couch's fifth amendment rights. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). *See generally Rhode Island v. Innis*, 446 U.S. 291, 298–302, 100 S.Ct. 1682, 1688–1690, 64 L.Ed.2d 297 (1980). After requesting counsel, however, Couch did not make any incriminating statements that led to the discovery of the drugs. Thus the discovery of the narcotics was not the result of an illegal interrogation. *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

**9.** Although a warrant or court order is not required, the agents in this case followed the procedure endorsed in *United States v. Aman*, 624 F.2d 911, 912–13 (9th Cir. 1980) and *United*

of *United States v. Ek,* 676 F.2d 379, 382 (9th Cir. 1982), we held that the stricter "clear indication" standard required for a body cavity search also applies to an x-ray search. Here, that standard was easily met by the information contained in the affidavit.

The adequacy of an informant's hearsay tip, which was the basis for the warrant in this case, is judged under the test of *Aguilar v. Texas,* 378 U.S. 108, 114, 84 S.Ct. 1509, 1513, 12 L.Ed.2d 723 (1964). We recently described the test as follows:

> First, the affidavit must inform the magistrate of some of the underlying circumstances that indicate that the informant's information is reliable. Second, it must inform the magistrate of some of the underlying circumstances from which the officer concluded that the informant, whose identity need not be disclosed, was credible.

*United States v. Whitney,* 633 F.2d 902, 905–906 (9th Cir. 1980). The two prongs of the *Aguilar* test are referred to as the "basis" and "veracity" prongs. 1 W. LaFave, *Search and Seizure* § 3.3, at 501–502 (1978). There is no question of veracity here; the confidential informant had supplied reliable tips on at least five previous occasions. *McCray v. Illinois,* 386 U.S. 300, 304, 87 S.Ct. 1056, 1058, 18 L.Ed.2d 62 (1967). The issue is whether the affidavit adequately disclosed the underlying circumstances indicating the informant's basis of knowledge.

The district court was apparently concerned that the affidavit provided no indication of how the informant obtained the information. In granting Couch's suppression motion, the court stated that the tip "merely indicated that there would be some people arriving and nothing more than that." The court placed little weight on the degree of detail in the affidavit, or on the corroborating circumstances occurring after the tip.

A tip that fails to disclose the basis of an informant's information can nevertheless be "verified" by its great detail. *Spi-*

nelli *v. United States,* 393 U.S. 410, 416, 89 S.Ct. 584, 589, 21 L.Ed.2d 637 (1969). The *Spinelli* Court suggested that the detail in *Draper v. United States,* 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959), was a "suitable benchmark." *Id.* In *Draper* the informant described the traveling plans and manner of dress of the suspect with great particularity, and thus the tip was adequate. *Id.* at 416–17, 89 S.Ct. at 589–590. Similarly, we have held that an affidavit is sufficient even in the absence of underlying circumstances indicating reliability, where the criminal activity is described in sufficient detail. *United States v. Fried,* 576 F.2d 787, 790 (9th Cir.), *cert. denied,* 439 U.S. 895, 99 S.Ct. 255, 58 L.Ed.2d 241 (1978). *See United States v. Maher,* 645 F.2d 780, 781 (9th Cir. 1981); *United States v. Beusch,* 596 F.2d 871, 874–75 (9th Cir. 1979).

The detail in the instant case dealt with both the innocent circumstances of Couch's trip, and the alleged criminal activity. The informant told customs authorities that Couch and another white male named Robert [Ek], and possibly others, would arrive at Los Angeles International Airport from Lima, Peru during the week of March 3, 1980. The informant disclosed exactly when and where the airline tickets were purchased, and provided a detailed description of the smuggling scheme: the smugglers would take laxatives to clean out their systems, swallow at least 30 capsules each containing one-half ounce of cocaine, take a drug to inhibit the normal functioning of their digestive systems, and take more laxatives once they were through customs and had reached their United States destination. The informant also told the agents that Couch had avoided an x-ray examination on a previous trip in 1979 by telling Peruvian officials that he had been overexposed to x-rays and feared further exposure.

In *United States v. Larkin,* 510 F.2d 13, 15 (9th Cir. 1974), we held that the *Aguilar* test was not met where the informant gave a detailed description of a car traveling on a certain highway at a certain time, and alleged that the car's occupants were carry-

States v. Cameron, 538 F.2d 254, 258–59 (9th

Cir. 1976), and obtained a court order.

ing narcotics. But more recently we made it clear that sufficient detail will cure an otherwise inadequate disclosure of the basis of the informant's knowledge,[10] by examining the affidavit in a "commonsense and realistic fashion." *United States v. Maher,* 645 F.2d 780, 782 (9th Cir. 1981), *citing United States v. Ventresca,* 380 U.S. 102, 109, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965). Here, the information provided by the informant more closely approximated the detail in *Maher* than in *Larkin,* especially considering the degree of detail in the criminal allegations themselves.

Finally, the details provided by the informants were corroborated by the observations of customs agents, which were included in the affidavit. *Cf. Spinelli v. United States,* 393 U.S. 410, 417–18, 89 S.Ct. 584, 589–590, 21 L.Ed.2d 637 (1969). The magistrate was informed that two individuals fitting the description provided by the informant's tip had in fact arrived at Los Angeles International Airport en route from Peru during the week indicated. The affidavit also stated that as of 2:30 p.m., Couch had refused to eat, defecate, or urinate during his detention. Finally, the affi-

davit stated that Couch refused to submit voluntarily to an x-ray examination, claiming that he had previously been overexposed and feared further x-rays for health purposes.

We conclude that the detail in the informant's tip was sufficient to establish a "clear indication" of body cavity smuggling.[11] This conclusion is bolstered by the degree of corroboration evident to the magistrate. Nothing occurring after Couch's arrival suggested that the informant was wrong. The corroborating circumstances, although perhaps innocent in themselves, strengthened the informant's tip and heightened the agents' justifiable suspicion of Couch. Couch's further refusal to submit to x-rays, and the reasons he advanced, were suspicious in light of the other information before the magistrate.[12] *United States v. Maher,* 645 F.2d 780, 782 (9th Cir. 1981); *United States v. Larkin,* 510 F.2d 13, 15 (9th Cir. 1974). The agents were aware that Couch had previously used the health ploy to avoid x-rays. While the use of such an excuse may itself be innocent, the likelihood of an individual giving that specific reason is so remote as to render Couch's

10. The self-verification approach has been criticized because detail might more appropriately be considered a component of veracity, not basis, but its use is well established. 1 W. LaFave, *Search & Seizure* § 3.3, at 544–46 (1978).

11. We are aware that in most body cavity search cases, the circumstances of the initial pat-down or strip search have provided the facts necessary for a more intrusive search. *See, e.g., United States v. Purvis,* 632 F.2d 94, 95 (9th Cir. 1980) (slow and careful walk, suspect uncomfortable while sitting); *United States v. Aman,* 624 F.2d 911, 912 (9th Cir. 1980) (restricted movements, prophylactics and lubricants in luggage); *United States v. Cameron,* 538 F.2d 254, 257 (9th Cir. 1976) (needlemarks, slurred speech, lubricant in rectal area).

12. Couch argues that his statement to Peruvian authorities should not be considered in evaluating the sufficiency of the affidavit, because customs agent Souza failed to check Couch's passport, which apparently did not have a Peruvian stamp for the time period in question. Couch's argument is that failure to check the passport created a reckless misstatement in the affidavit. *Franks v. Delaware,* 438 U.S. 154, 171, 98 S.Ct. 2674, 2684, 57 L.Ed.2d 667 (1978).

It is not clear what weight the district court gave to this argument in finding the affidavit insufficient. To the extent that the district court may have disregarded part of the affidavit because of Souza's alleged misstatement, it was clearly in error.

First, upon receiving word that Couch had arrived, Souza went straight to the United States Attorney's office, not the airport. Even if he had asked another agent to check the passport, the lack of a Peruvian stamp would not have necessarily meant that Couch was not in Peru on a previous occasion. In addition, Couch admitted being in Peru during November of 1979. A one month error in the affidavit cannot be classified as a material misstatement. More importantly, an affiant does not have a duty to verify all of the assertions in an affidavit, especially when there has been no indication that the information is incorrect. Failure to verify Couch's previous presence in Peru was at most negligence, not reckless disregard for the truth, thus the *Franks* rationale does not apply. *United States v. Young Buffalo,* 591 F.2d 506, 510 (9th Cir.), *cert. denied,* 441 U.S. 950, 99 S.Ct. 2178, 60 L.Ed.2d 1055 (1979). *See United States v. Maher,* 645 F.2d 780, 782 (9th Cir. 1981).

explanation strong corroboration. The magistrate was justified in issuing a court order for the x-ray examination [13] of Couch.

CONCLUSION

Applying the clearly erroneous standard to the determination of reasonableness of the detention made by the district court in its suppression order, we do not reverse lightly. Nevertheless, we are convinced that the law of this circuit authorizes border detentions of suspected smugglers pending the procurement of a warrant or court order. In addition, we find that the affidavit supplied in this case was sufficient to support a court order under the probable cause standard, which would satisfy the warrantless standards of "real suspicion" or "clear indication" of drug smuggling. The previously reliable informant's tip specifically outlined the details of the smuggling scheme, and was corroborated by customs agents.

We believe that under the circumstances of this case the customs agents had enough evidence indicating that drugs were being smuggled that they could have insisted on an x-ray search, or in lieu thereof, detention until Couch's stomach contents were emptied, even without a court order. Securing the order, however, was the preferable approach and the detention required for that purpose was not unreasonable.

For the foregoing reasons, the district court suppression order is REVERSED and the case is REMANDED for further proceedings.

---

**13.** Couch's argument, that the x-ray procedures were unreasonable because twelve x-rays were taken and his medical objections were not heeded, is unpersuasive. The magistrate ordered an x-ray examination conducted in a reasonable manner, at a local hospital, by a person licensed to conduct the procedure. Couch signed a consent form once shown the court order, and had a chance to voice his medical objections. There is no indication that the procedure followed in this case was "unconscionable," as Couch contends. The use of x-ray examinations to conduct body cavity searches has been accepted by this court. *United States v. Aman,* 624 F.2d 911, 913 (9th Cir. 1980).