**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Rosa Elvira MONTOYA de HERNANDEZ, Defendant-Appellant.**

**No. 83–5125.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 8, 1983.

Decided April 24, 1984.

Janet Levine, Deputy Public Fed. Defender, Los Angeles, Cal., for defendant-appellant.

Jeffrey S. Niesen, Asst. U.S. Atty., Los Angeles, Cal., for plaintiff-appellee.

Before GOODWIN and TANG, Circuit Judges, and JAMESON, District Judge.[*]

PER CURIAM.

Rosa Montoya de Hernandez appeals her convictions for possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1) and for importation of cocaine in violation of 21 U.S.C. §§ 952(a) and 960(a)(1). She argues that the district court erred in failing to suppress 88 bags of cocaine that passed through her alimentary canal after a lengthy airport detention following her arrival on a flight from Bogota, Colombia.

The question in this case is to locate that point on a continuum at which the level of well-founded suspicion on the part of the customs officers justifies the harsh choices which the officers may present to an incoming passenger. It is clear from the cases [1] that a fairly low level of suspicion will permit a moderately intrusive search for contraband. It is equally clear from the cases [2] that the more intrusive and insulting the search, the greater must be the probability, based upon facts known before the search is made, that the search will indeed produce contraband. Bearing these general guidelines in mind, we examine the facts of this case.

Shortly after midnight on March 5, 1983, Ms. Montoya de Hernandez arrived in Los Angeles aboard a flight from Bogota, Colombia. She presented her passport and visa to immigration officials and proceeded to a customs line.

Customs officials reviewed her documents and directed her to a secondary area

[*] The Honorable William J. Jameson, Senior United States District Judge for the District of Montana, sitting by designation.

1. A person entering the country is subject to routine searches without probable cause. *United States v. Ramsey,* 431 U.S. 606, 619, 97 S.Ct. 1972, 1980, 52 L.Ed.2d 617 (1977).

2. *Ramsey* notes that warrants are not required for border searches, but this circuit has indicated in dictum that while a warrant is not mandatory in body cavity searches, "the absence of a warrant is an important factor in assessing the reasonableness with which the authorities acted." *United States v. Cameron,* 538 F.2d 254, 259 (9th Cir.1976). Following *Cameron* we have had a number of published opinions and countless unpublished dispositions dealing with border searches made with and without warrants, and with or without some element of delay. *See, e.g., United States v. Couch,* 688 F.2d 599 (9th Cir.1982), and cases collected therein.

for a more thorough examination. There an Inspector Serrato reviewed de Hernandez's documents and questioned her regarding her trip to the United States. Serrato testified that he immediately suspected that de Hernandez was carrying drugs internally because she fit the common profile of an internal-body carrier.[3]

Serrato had de Hernandez taken to another room for a pat down. That search failed to reveal evidence of contraband. The arriving passenger was then asked if she would consent to an x-ray search. She initially indicated that she would consent, but when she was told she would be taken to a hospital in handcuffs for the x-ray, she withdrew her consent. Officer Serrato's supervisors then contacted Special Agent Windes for the purpose of obtaining a court order for an x-ray search. *See United States v. Erwin*, 625 F.2d 838 (9th Cir. 1980).

Windes decided that the facts then known probably would not support a court ordered x-ray examination. At this time the arriving passenger had not yet been detained for an unusual period of time. Windes told Serrato and his supervisors to give the passenger three choices: She could either consent to an x-ray search, be held in custody until her bowels moved, or depart the United States on the next plane for Colombia. De Hernandez reluctantly consented to leave for Colombia, but the next flight could not be arranged for several more hours. She was therefore left with the "choice" of consenting to an x-ray or remaining in custody until her peristaltic functions produced a monitored bowel movement. She was taken to a room and held under the observation of Serrato and other inspectors for the remainder of the night and most of the next day, a total of some 16 hours.

A strip search after the 16-hour delay again failed to reveal contraband. Agent Windes decided to seek a court order for an x-ray and body cavity search. The application for the court order contained information gleaned during the 16-hour detention and observation of the passenger. This information included refusal of food and water and symptoms of discomfort suspected to arise out of, or at least to be consistent with, heroic efforts to resist the usual calls of nature. At midnight the order was issued, nearly 24 hours after her plane had landed.

De Hernandez was taken to a hospital where a rectal examination revealed a balloon containing cocaine. She was given the *Miranda* warnings and taken to jail. During the next 4 days she passed 88 balloons containing cocaine.

■■■ "As a search becomes more intrusive, it must be justified by a correspondingly higher level of suspicion of wrongdoing." *United States v. Ek*, 676 F.2d 379, 382 (9th Cir.1982) (citing *United States v. Aman*, 624 F.2d 911, 912–13 (9th Cir.1980)). Therefore, a "real suspicion" that contraband is concealed on the body of the person to be searched is required for a strip search. *United States v. Guadalupe-Garza*, 421 F.2d 876, 879 (9th Cir.1970). X-ray and body cavity searches are more intrusive than a strip search. Such searches require a " 'clear indication' or 'plain suggestion' that the person is carrying contraband within his body." *Ek*, 676 F.2d at 382 (citation omitted.) In this case, the officers had a strong suspicion that de Hernandez was carrying drugs in her body, but for more than 16 hours they did not apply for a court order. The officers decided, instead, to wait for nature to provide the stronger evidence that would support an order. This decision necessarily impacted both the comfort and the dignity of a human being.

---

**3.** De Hernandez had paid cash for her ticket, came from a source port of embarkation, carried $5,000 in U.S. currency, had made many trips of short duration into the United States, had no family or friends in the United States, had only one small piece of luggage, had no confirmed hotel reservations, did not speak English, and said she was planning to go shopping using taxis for transportation. Prior cases of body smugglers had taught the agents to regard these factors in various combinations as highly likely to identify a drug carrier. This particular suspect possessed almost all of the indicators.

The degree of suspicion necessary to justify a detention for the purpose of having a suspect produce a bowel movement has not been established. In *United States v. Couch,* 688 F.2d 599 (9th Cir. 1982), *cert. denied,* 459 U.S. 857, 103 S.Ct. 128, 74 L.Ed.2d 110 (1982), we affirmed the conviction. The customs officials in *Couch* had the usual indications of internal smuggling, plus an informant's tip. The suspect's detention while a court order for an x-ray was sought was therefore reasonable. We did not then have to reach the issue whether the customs officials without a court order, could have detained the suspect on the same level of suspicion until his bodily processes had cleared his digestive tract of its contents. *Couch,* 688 F.2d at 603 n. 5. In *Couch* we noted that such a detention could last two or three days. *Id.*

What circumstances justify the delay imposed in this case? These cases usually turn upon the sufficiency of the original evidence which establishes in the customs officer's mind the belief that the incoming passenger "fits the drug courier profile". If that evidence is strong, and where it is enhanced by a tip from a reliable informer, we have upheld lengthy delays and highly obtrusive searches. *See, e.g., Erwin, Couch, Ek,* and cases discussed therein. These cases suggest that when in doubt the customs officers should present their information to a magistrate and permit that judicial officer to exercise judicial discretion in striking the delicate balance between human rights and the practical necessities of border security.

In the case at bar, there was a justifiably high level of official skepticism about the woman's good faith as a tourist; but at the same time the officers knew that thousands of unusual looking persons cross international borders daily on all sorts of errands, many of which are wholly innocent. At the time the officers offered de Hernandez the alleged choice of taking the next plane back to Bogota (and remaining under observation during the wait), or submitting to a custodial x-ray examination, the officers knew that no plane would be leaving for Bogota for several more hours.

The officers accordingly knew that the woman would suffer many hours of humiliating discomfort if she chose not to submit to the x-ray examination. Under the circumstances of this Hobson's choice, one can hardly characterize as voluntary any decision on the part of de Hernandez to consent to wait under observation. Rather, the officers effectively decided that if she did not wish to submit to an x-ray examination, she could just wait until natural processes made that type of examination unnecessary, no matter how long that might be.

The officers themselves had limited options in the face of their strong belief that de Hernandez was a drug courier. They could let her into the country and try to follow her; they could seek a court order for an x-ray without undue delay; or they could detain her until nature took its course. They chose the latter. While there is some doubt about the humanity of the course the officers followed, it does have some support in the cases. *See, e.g., Erwin, supra.* However, following *Ek, supra,* this court decided *United States v. Quintero-Castro,* 705 F.2d 1099 (9th Cir. 1983). It is difficult to distinguish the facts known to the customs officers when they decided to detain de Hernandez from the facts known to the officers and transmitted to the magistrate in *Quintero-Castro.* In *Quintero-Castro* we held those facts to be insufficient to authorize the warrant for an x-ray search. Here, if the facts apparent upon arrival would not authorize the issuance of a warrant, it is difficult to hold that the same facts would authorize the long period of detention which eventually did produce some additional evidence in support of a warrant. Under the teaching of *Quintero-Castro,* if not compelled by the holding, the trial court should have suppressed the evidence in this case.

Contrary to the government's assertions, we find the result in *United States v. Mendez-Jimenez,* 709 F.2d 1300 (9th Cir.1983), distinguishable from the present fact pattern. In *Mendez-Jimenez,* the court found

that an x-ray search which revealed foreign objects in defendant's body was not conducted in violation of the Fourth Amendment. *Id.* at 1304. We first note that unlike the present case, the customs officers in *Mendez-Jimenez* petitioned the magistrate for a court order authorizing an x-ray examination as soon as their preliminary investigation was completed. Additionally, the evidence submitted to the magistrate in *Mendez-Jimenez* contained several factors supporting a finding of clear indication that did not exist in the present case: (1) defendant's possession of an anti-diarrhea medication, (2) evidence of nonconsumption of food or beverages before defendant was detained and during the preliminary investigation, and (3) evidence of passport tampering. Moreover, the decision by the customs officers in the present case not to seek a court order for an x-ray search was based in part on their belief that they did not have sufficient facts to support the issuance of the order. We find that, in the instant case, the evidence available to the customs officers when they decided to hold de Hernandez for continued observation was insufficient to support the 16-hour detention.

Reversed.

JAMESON, District Judge, dissenting:

I respectfully dissent.

The Fourth Amendment functions "to protect personal privacy and dignity against unwarranted intrusion by the State." *Schmerber v. California,* 384 U.S. 757, 767, 86 S.Ct. 1826, 1834, 16 L.Ed.2d 908 (1966). It is undisputed here that the initial strip search was not an unwarranted intrusion on de Hernandez's privacy and dignity. The sole question is whether the subsequent detention, with the possibility that she would produce a monitored bowel movement, thereafter became an unwarranted or unreasonable intrusion on her privacy and dignity. This question requires us to strike a delicate balance. I would strike the balance in favor of the Government.

I recognize that a close question is presented, particularly under *United States v. Quintero-Castro,* 705 F.2d 1099 (9th Cir.1983). In my opinion, however, *Quintero-Castro* and the other cases cited in the majority opinion may be distinguished.[1] The opinion contains a fair summary of the facts. In addition, however, the following may be considered:

First, while the initial purpose of the detention was to "[have] a suspect produce a bowel movement," in fact no such bodily function occurred. Instead, the customs agents merely observed and occasionally questioned Ms. de Hernandez for a period of 16 hours. From their observations, they gained further evidence that, in the magistrate's view, gave a "clear indication" of alimentary canal smuggling. Consequently, the detention was minimally intrusive, and though de Hernandez may have suffered "many hours of humiliating discomfort", she was herself solely responsible for a considerable part of it.

Even if de Hernandez had performed her peristaltic functions under the observation of a customs official, I would hold that the detention did not thereby become significantly more intrusive than a strip search. Certainly, performing such bodily functions while under observation imposes on an individual's dignity, but such an imposition does not differ dramatically from a strip search.[2] In both cases the "search" con-

1. *Quintero-Castro* involved an X-ray rather than detention, and we expressly recognized that "X-ray and body cavity searches are the most intrusive", requiring a " 'clear indication' or 'plain suggestion' that the person is carrying contraband within his body." A "real suspicion" is sufficient for a strip search. 705 F.2d at 1100.

2. A valid strip search may involve "a visual search of the anal region." *United States v. Sosa,* 469 F.2d 271, 273 (9th Cir.1972), *cert.*

*denied,* 410 U.S. 945, 93 S.Ct. 1399, 35 L.Ed.2d 612. We have also upheld a strip search in which the female suspect was asked "to turn around and bend over." *United States v. Shields,* 453 F.2d 1235, 1236–37 (9th Cir.1972), *cert. denied,* 406 U.S. 910, 92 S.Ct. 1615, 31 L.Ed.2d 821, cf. *Henderson v. United States,* 390 F.2d 805 (9th Cir.1967) (suspect made to "manually open her vagina for visual inspection" constituted body cavity search).

sists of passive visual inspection of the body's surface and, in this case, of its waste products. On the other hand, we distinguish body cavity and X-ray searches precisely because they intrude "beyond the body's surface." *United States v. Aman,* 624 F.2d 911, 912 (9th Cir.1980). We have noted that body cavity searches are sometimes painful and always invade "the most intimate portions of [the suspect's] anatomy," *United States v. Cameron,* 538 F.2d 254, 258 (9th Cir.1976). Additionally, X-rays pose the potential for physical harm to the suspect. See *United States v. Ek,* 676 F.2d 379, 382 (9th Cir.1982). The detention in this case did not contemplate an invasion beyond the body's surface nor did it require the same degree of humiliation attendant on such an invasion.

Second, this court recently recognized "that smuggling by ingestion into the alimentary canal does not leave the external signs that body cavity (e.g., rectum or vagina) smuggling does." *United States v. Mendez-Jimenez,* 709 F.2d 1300, 1303 (9th Cir.1983) (Citation omitted). As a result, many of our prior decisions are simply not analogous to the present facts, particularly cases where we relied on the suspect's unnaturally stiff and erect gait, restricted body movements and possession of lubricants to demonstrate a clear indication of body cavity smuggling. See, *e.g., United States v. Shreve,* 697 F.2d 873 (9th Cir. 1983); *United States v. Aman,* 624 F.2d 911.

It is clear that narcotics smugglers have become increasingly adept at concealing contraband. Consequently, the indicia used by customs officials to identify smugglers have in some cases become more general and circumstantial. Alimentary canal smugglers, for example, prepare their bodies by first taking laxatives to clear their digestive tracts; they then swallow their valuable cargo of narcotics often in cap-

sules or "balloons"; finally they take certain drugs to inhibit digestion and prevent diarrhea during their *usually brief* flight to the United States. Once they reach their destination, they take another laxative to retrieve the narcotics. See *United States v. Couch,* 688 F.2d 599, 600 (9th Cir.1982). Beyond the usual "profile" of the narcotics smuggler, therefore, there are only a few consistently apparent and reliable indications that a person is smuggling narcotics in his alimentary canal. The two most common indications are the consistent refusal to eat or drink and the suspect's often Herculean efforts to stifle his natural peristaltic functions.

It must be stressed that the foregoing indications of alimentary canal smuggling can only be observed *over a period of time.* Allowing a reasonable period of detention, based on a real suspicion, is the least intrusive and most reliable means of identifying alimentary canal smugglers.[3]

Third, it is well settled that we do not review evidence supporting a "real suspicion" or a "clear indication" of smuggling in light of our own experiences or those of a reasonable man:

> On the contrary, the question is whether an experienced customs officer ... after assessing the totality of the evidentiary factors and circumstances in the light of his own training and experience, would conclude that there was a clear indication that the defendant was engaged in internal body smuggling.

*United States v. Mendez-Jimenez,* 709 F.2d at 1302–03 (Citation omitted). It is undisputed in this case that the facts initially known by the customs officials justified a "real suspicion" that de Hernandez was carrying narcotics. The first strip search was valid in light of their real suspicion. Similarly, in determining whether the subsequent detention was valid, we must give

---

**3.** As a practical matter, of course, a detention would not be necessary if customs officials could seek a court order for an X-ray on the basis of a "real suspicion". In *United States v. Ek,* 676 F.2d 379, 382 (9th Cir.1982), however, we adopted the higher "clear indication" stan-

dard for X-ray searches. As the court recently observed, the wisdom of this decision may be questioned, but it is the law of the circuit. *United States v. Shreve,* 697 F.2d 873, 874 (9th Cir. 1983).

due weight to the good faith, experienced assessment of the customs officials.

I would permit reasonable detentions at the border for the purpose of observing persons suspected of alimentary canal smuggling so long as the detention is based on a real suspicion sufficient to justify a strip search. In *United States v. Couch,* 688 F.2d 599, 603–04 (9th Cir.1982), we held that an extended detention is valid if it is reasonably related to a valid search. We also pointed to the well established rule that "[g]overnment agents are given considerably more leeway at the border." *Id.* at 602. Since the strip search was valid in this case and given the elusive nature of the smuggling suspected here, I think the detention was reasonably related to the initial search. See also *United States v. Ek,* 676 F.2d at 382; *United States v. Erwin,* 625 F.2d 838, 841 (9th Cir.1980). Although the detention was perhaps longer than absolutely necessary, I do not think it was unreasonable. The additional evidence obtained during the observation period demonstrated a clear indication of alimentary canal smuggling.

To deny the validity of reasonable detentions would reward the increasing ingenuity of narcotics smugglers and seriously hamstring the good faith efforts of customs officials to stem the flow of illegal narcotics across our borders. Eighteen years ago, this court declared that its review of border searches must "be governed by the practical knowledge of the extent to which smugglers are willing to degrade their bodies in order to obtain the drugs they crave or the money they desire." *Rivas v. United States,* 368 F.2d 703, 710 (9th Cir.1966). Nor can we ignore the generally improved treatment of smuggling suspects at the border,[4] the regularity with which customs officials now seek court orders and warrants, and the ready availability of relatively unintrusive X-ray procedures as an alternative to body cavity searches. These are all factors which must be con-

sidered "in striking the delicate balance between human rights and the practical necessities of border security." I would strike the balance here in favor of the Government.

I would affirm.

---

4. *Cf. United States v. Cameron,* 538 F.2d 254, 256–57 (9th Cir.1976); *Blefare v. United States,* 362 F.2d 870 (9th Cir.1966); *Blackford v. United* States, 247 F.2d 745 (9th Cir.1957), *cert. denied,* 356 U.S. 914, 78 S.Ct. 672, 2 L.Ed.2d 586.