Sanders, Janet L., J.
This case presents the question of how long and under what circumstances an individual may be detained in order for police to confirm or dispel their suspicion that he is carrying illegal narcotics inside his body. In the instant case, the defendant was held for more than three days under 24-hour guard in an Everett hospital without access to a lawyer and with no determination that there was probable cause to hold him. During this time, he was prevented from calling anyone, deprived of all solid foods, and required to ingest a large quantity of laxatives. The Commonwealth justifies this as a legitimate exercise of law enforcement’s authority in its ongoing war on drugs. This Court disagrees and concludes that the defendant’s Motion to Suppress Evidence must be Allowed.
FINDINGS OF FACT
At 7:30 a.m. on May 4, 2012, a man later identified as the defendant arrived on a Jet Blue flight from the Dominican Republic. He presented his passport to customs agent Emily Fraser, who communicated with him in his native language of Spanish. On his passport he had what is called an “ADIT” stamp showing that he was a permanent resident of the United States. Fraser asked if he had a green card, and he said that he had lost it and had applied for a new one. On his customs declaration card, the defendant listed his destination as the Bronx, New York; when asked for more detail, defendant explained that he lived there and produced a New York driver’s license. Fraser asked him what he was doing in Boston. He said that he was there for his cousin’s wedding and planned on taking a bus back to New York. He was asked the cousin’s name and after a moment’s hesitation, he provided the name, Fraser jotted down that name on his customs declarations form.
Although the ADIT stamp is enough to admit someone into the United States, Customs is entitled to question a person who has only a stamp and no green card to make sure that the stamp is valid and that he has no removal proceedings pending against him. Fraser referred the defendant for what she called a “secondary” inspection by customs officials at the baggage check. It was quickly determined that the defendant was indeed a legal resident with permission to enter into and travel out of the country. His bags were checked and nothing was found. His person was searched; again, nothing of note was found in this search. Customs officials had no information at that point that the defendant had committed any crime. He was nevertheless separated from his phone and his belongings and placed in a private room out of the public’s view where he was grilled by customs officials for the next eight hours. Officials also searched the “contact” list on his phone and prevented him from answering any calls, instead answering those calls themselves.
The precise sequence of events was not entirely clear at the evidentiary hearing. Moreover, much of the questioning seems to have been conducted in English, since Fraser (the only Spanish speaker) was present for only part of the questioning and the other customs agent who participated in the questioning did not speak Spanish.[1] Without taking into account language differences which might explain some discrepancies, the eight hours of interrogation revealed the following. The defendant’s ostensible purpose for being in Boston was to attend his cousin’s wedding but he did not have a wedding gift in his baggage or attire that the customs agents believed to be appropriate for such an event. He repeated his claim that a relative was going to pick him up at the airport and produced a piece of paper with the name “Ana” on it and a telephone number. Customs agent Michael Car-bone decided to call the number and it was answered by a man who spoke only Spanish. Carbone brought in Fraser to assist and the man told her that he was the defendant’s brother-in-law “Hector.” He said that his wife was outside the airport to pick up the defendant. When asked if they had special plans, Hector said that they did not. He was not directly asked about any wedding. He hung up when Fraser identified herself as a customs agent.
In the meantime, defendant’s cellphone (which had been taken from him) had been ringing. The “caller ID” on the phone identified the caller as “Potts” and it had an area code indicating that it was coming from the Dominican Republic. Fraser answered the phone and asked who it was. The caller said he had the wrong number. Agents looked through the defendant’s contacts on the cell phone and it contained the name Potts. They called back and challenged the man about having the wrong number: the man hung up.
When asked why he had been in the Dominican Republic, the defendant said that he was there to visit his sick father. He said that his sister could confirm that. With Fraser’s assistance, customs agents called the sister and she did indeed confirm the defendant’s story about his travels there; she said she did not know why he was in Boston, however, and did not know of any relative there. They next called the defendant’s wife in New York; she confirmed that she lived with him there but she had no knowledge of a wedding and did not know any Boston relatives. When asked why his wife would say that, the defendant said that he had not wanted her to think he was seeing another woman and therefore had not confided in her about his trip to Boston.
At some point, the agents asked the defendant if would submit to an X-ray of his abdomen. He refused, *434 saying that he had a bad medical experience, and indicated he had some metal plate in his head. They said that if he would not submit to having an X-ray, then they would have to take him to a hospital. The defendant objected, saying that they had no right to continue to hold him. At around 4:00 p.m. he was taken to Whiddin Hospital in Everett.
This decision to place him in the hospital was done after customs agents consulted with an Assistant United States Attorney. At the same time that the lawyer authorized the defendant’s continued detention, he (or she) declined federal prosecution. In the event any drugs were found, the matter would be for state authorities.
The defendant was formally admitted to a hospital room at 10:00 p.m. on May 4. The delay was due to the fact that he refused to sign a consent form agreeing to his admission. For the next three days, the defendant was confined to a hospital room under 24-hour guard by customs agents. He had his hands shackled to the bed for much of the time; although he was periodically allowed to walk the corridors, it was only with a police escort. He was not allowed to use the phone. No charges were filed against him, there being insufficient evidence to lodge any charges at that point.
The defendant was not permitted to eat any solid food during this three-day period; instead, he was administered nutrients intravenously. He was also required to drink a substance called “Go Lytely”—the same liquid administered to patients in preparation for a colonoscopy. Although he did not drink this happily, neither did he actively resist taking it: medical records show that he consumed at least a half-gallon of the stuff. The purpose of this “treatment” was to cause the defendant to have a bowel movement. In fact, medical records show that the defendant did have several bowel movements over the next couple of days. They were deemed by the agents present not to be substantial enough to rule out their suspicions that he was a drug courier, so his detention continued. When the Go Lytely did not produce the desired effect, the defendant was required to ingest an additional more powerful laxative called magnesium citrate.
At one point, the defendant was given an ultrasound. The medical records showed that there were some shadowing in his intestinal area, but the radiologist was unable to determine the source of these shadows, ruling the ultrasound “inconclusive” as to the presence of foreign bodies. Finally, on May 7 at 7:30 p.m., three and a half days after the defendant first arrived in the United States, he expelled a small pellet containing what was field tested as cocaine. Over the next few hours, he expelled ninety more small packets. He was charged with trafficking in cocaine.
CONCLUSIONS OF LAW
The case before me presents two issues. First, did law enforcement have enough information to detain the defendant as a drug smuggler? Second, even if they did, could customs agents continue to hold him over a period of three days under circumstances equivalent to an arrest without any independent determination from a neutral and detached magistrate? This Court answers both questions in the negative.
As to what quantum of information is required under the Fourth Amendment, United States v. Montoya de Hernandez, 473 U.S. 531 (1985) [Montoya), is controlling. The Supreme Court held in that case that the detention of a traveler at the border beyond the scope of a routine customs search and inspection is justified at its inception if customs agents have a “particularized and objective basis for suspecting” that the individual is engaged in alimentary canal smuggling. 473 U.S. at 541. The Court acknowledged that the Fourth Amendment requirement of reasonableness depends on striking the proper balance between the government’s interests on the one hand and the privacy interest of the individual on the other. At the borders, however, that balance is struck much more favorably for the government, given its strong interest in preventing the introduction of illicit narcotics into the United States. Accordingly, something less than probable cause is required.
The defendant argues with some persuasiveness that this Court should decide this case under article 14 since an Assistant United States Attorney informed customs agents early on that his office was declining federal prosecution. That meant that, in the event any drugs were found, the defendant would be prosecuted in state court, where it would seem that he would be entitled to the broader protections of the Massachusetts Declaration of Rights. This Court is of the view that, if article 14 does apply to this case, then the Supreme Judicial Court would not adopt the reasonable suspicion test of Montoya but would require something closer to probable cause.
I reach that conclusion because the SJC has in the last two decades interpreted article 14 to provide greater protections against government searches and seizures than the Supreme Court has been willing to grant in similar circumstances. See, e.g., Commonwealth v. Balicki, 436 Mass. 1, 9 (2002) (declining to abandon the inadvertence requirement of the plain view exception to the warrant requirement under Article 14 as the Supreme Court did under the Fourth Amendment); Commonwealth v. Gonsalves, 429 Mass. 658, 663 (1999) (under Article 14, unlike under the Fourth Amendment, a police officer may not order the occupants of a lawfully stopped vehicle out of the vehicle as a matter of course); Commonwealth v. Stoute, 422 Mass. 782, 789 (1996) (person is seized under Article 14 when police pursue the person with the obvious intent of requiring him or her to submit to questioning, rejecting Supreme Court’s decision in Californiav. HodariD., 499 U.S. 621 (1991)); Commonwealth v. Upton, 394 Mass. 363, 373 (1985) (“We *435 conclude that art. 14 provides more substantive protection to criminal defendants than does the Fourth Amendment in the determination of probable cause”). If my prediction is correct and the SJC would require a higher quantum of information to justify the intrusion here, then there can be no real dispute that the customs agents did not have sufficient evidence to justify the defendant’s detention here.
Assuming, however, that only the Fourth Amendment applies to the detention of an individual at the borders, this Court is still not convinced that the information available to agents here met even the more relaxed standard of reasonable suspicion announced by Montoya, In reaching that conclusion, I note that the following facts were present in Montoya which are not present here. Montoya’s documents showed that she had made at least eight recent trips to the United States—all to either Miami or Los Angeles. In the instant case, customs agents did not have any information about the defendant’s past travels to arouse their suspicions. In Montoya, the defendant’s abdomen felt hard to the touch, and she was wearing two pairs of elastic underpants with a paper towel lining the crotch area. In the case before this Court, the defendant was not wearing any special undergarments. During the sixteen hours Montoya was held, she exhibited symptoms of discomfort consistent with “heroic efforts to resist the usual calls of nature,” as the circuit court had noted. 731 F.2d 1371. In the case before this Court, the defendant showed no such outward signs, and did not make any visible effort to keep himself from going to the bathroom, even while in the hospital for a prolonged period of detention. In Montoya, the defendant was carrying $5,000 in cash and her luggage contained only a small amount of clothing and no extra pair of shoes. In the instant case, nothing unusual was found in a search of the defendant’s person or of his luggage. In Montoya the defendant told the agents she was in town to buy items for her husband’s store, but had no list of vendors, no hotel reservations, no credit cards or letters of credit. Although there were inconsistencies in the defendant’s story here, in contrast to Montoya some parts of it actually checked out.
For example, he said he was in Santo Domingo to visit his sick father—a claim verified by a call to his sister. He said he lived in New York with his wife, and produced a New York driver’s license; he also provided a phone number for his wife, who verified that he lived there with her. He said he was being picked up by a relative, and produced a phone number; calling that number customs agents talked to an individual who said that his wife was outside the airport to pick him up. That neither the defendant’s wife nor his sister knew why he was in Boston—and that his story about a wedding might not be true—does not in and of it suggest that his purpose for being here was to smuggle in drugs. In short, there was enough to arouse a generalized suspicion, but not enough for customs agents to reasonably suspect the defendant specifically of alimentary canal smuggling.
That is important, because the thinking of the courts in approving a prolonged detention of those suspected of being “balloon swallowers” rests entirely on the premise that the only way to confirm or dispel suspicion in such cases is to wait for a bowel movement. If one has only a generalized suspicion of wrongdoing, then the justification for holding an individual under circumstances equivalent to an arrest and force-feeding him laxatives necessarily disappears. That is precisely what happened here. Having inadequately explained his presence in Boston after eight hours of questioning at the airport, the defendant was transported to a hospital where he was chained to a bed and guarded on a 24-hour basis by customs agents for the next three days. He was not allowed to use the telephone, much less given a chance to talk to a lawyer. He was not allowed to eat or drink and was forced to ingest large quantities of Go-Lytely. Significantly, the information in the hands of the customs agents did not increase in any measurable way during these three days of detention. The ultrasound was inconclusive as to what was creating the shadow in his abdomen, and the defendant displayed no physical signs of distress calling for emergency medical treatment. Although not happy about being there, he did not actively resist either.
The length of this detention arid the circumstances surrounding it also go to the second issue raised by this case: did law enforcement exceed the scope of any permissible detention by holding the defendant as long as they did? The Supreme Court in Montoya refused to set any “hard and fast time limits” on how long authorities may detain one suspected of alimentary canal smuggling, saying only that “common sense” and “ordinary human experience” should govern. 473 U.S. at 543. It did note that the length of time the defendant was held in the case before it—sixteen hours—exceeded any other detention that the court had ever approved based on reasonable suspicion alone. Certainly, cases decided after Montoya do not particularly assist in arriving at any clear answer. What at least some of these decisions do suggest, however, is that after a certain period of time, authorities must seek some judicial approval. For example, in United States v. Esieke, 940 F.2d 29 (2d Cir. 1991), the Second Circuit announced that if one suspected of alimentary canal drug smuggling is detained more than 24 hours, then authorities must notify not only the United States Attorney, but also a lawyer—either the defendant’s own attorney or a public defender. Most important, the authorities must notify a federal magistrate so as to get an independent assessment of the information on which they are basing their actions. The Fifth Circuit reached a similar conclusion in United States v. Adekunle, 2 F.3d 559, 562 (5th Cir. *436 1993). Noting that it is an “absurdity that one may have his liberty restrained for a longer period based on a mere suspicion than he lawfully could be detained based on probable cause,” it held that the government must seek judicial approval within 48 hours of the initial detention of an alimentary canal drug smuggler. 2 F.3d at 561. Without that approval, the detention is not valid unless the government shows a “bona fide emergency or extraordinary circumstances justifying the lengthier delay.” 2 F.3d at 562.
That approach makes sense to this Court. The intrusion on one’s privacy is not minimal here: indeed, it is a frontal assault on one’s bodily integrity, particularly when it stretches into days. Whether that massive and very personal intrusion is warranted should not be decided by customs agents who are neither neutral nor detached from the situation. That they indeed have a reasonable suspicion that the individual is carrying drugs inside of him should at the very least be confirmed by someone who is not working for law enforcement. Certainly, there is no exigency which would excuse the agents from seeking a magistrate’s approval: the defendant is not going anywhere. To require customs to make their case of reasonable suspicion to a judge ex ante rather than at a suppression hearing strikes a proper balance between the governmental interest of drug interdiction on one hand and the privacy interest of the individual on the other.
CONCLUSION AND ORDER
For all the foregoing reasons, the defendant’s Motion to Suppress Evidence is ALLOWED.

Nhe defendant used a court interpreter at the evidentiary hearing. This Court saw nothing to indicate that this was a ploy on his part.